Jason Ebe (#017216)
jebe@swlaw.com
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070

*Attorney for Bombardier Transportation (Holdings) USA Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BOMBARDIER TRANSPORTATION (HOLDINGS) USA INC., <br><br> Plaintiff, <br><br> v. <br><br> HDR ENGINEERING, INC., THE CK GROUP, INC., AND STRUCTURAL GRACE, INC. <br><br> Defendants. | No. <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Bombardier Transportation (Holdings) USA Inc. ("Bombardier") files the following Complaint against HDR Engineering, Inc. ("HDR"), The CK Group, Inc. ("CK"), and Structural Grace, Inc. ("SGI").

**PARTIES**

1.  Plaintiff, Bombardier Transportation (Holdings) USA Inc., is a Delaware corporation with its principal place of business located at 1251 Waterfront Place, Pittsburgh, PA 15222.  Bombardier is a world leader in the rail equipment manufacturing and servicing industry.

2.  Upon information and belief, Defendant, HDR Engineering, Inc., is an Arizona corporation having its principal place of business at 3800 N. Central Avenue, Suite 460, Phoenix, AZ 85012.

3.  Upon information and belief, Defendant, The CK Group, Inc., is an Arizona corporation having its principal place of business at 16448 N. 40th Street, Suite A,

Phoenix, AZ 85032.

4. Upon information and belief, Defendant, Structural Grace, Inc., is an Arizona corporation having its principal place of business at 808 North 1st Street, Phoenix, AZ 85004.

## JURISDICTION AND VENUE

5. Plaintiff brings its Complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6. This Court has personal jurisdiction over Defendants because, *inter alia*, they are residents of this State, have transacted, and will be transacting, business in this State, and have caused harm or tortious injury in this State by acts within this State.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because, *inter alia*, this is the judicial district in which Defendants reside and a substantial part of the events giving rise to these claims occurred in this judicial district.

## FACTUAL BACKGROUND

**A.   The Phoenix Sky Harbor International Airport PHX Sky Train System.**

8. On or around July 1, 2009, Bombardier and the City of Phoenix entered into a contract for Bombardier to design, build, operate, and maintain the Phoenix Sky Harbor International Airport PHX Sky Train System ("PHX Sky Train System") at the Phoenix Sky Harbor International Airport ("Sky Harbor Airport") (collectively, the "Project").

9. The PHX Sky Train System is an environmentally friendly, automated rail system that transports airport visitors and employees to and from different parts of Sky Harbor Airport and to the Phoenix light rail system.

10. The PHX Sky Train System consists of two to three car, driverless trains that run on an electrically powered, center-rail guideway. The PHX Sky Train System has approximately eighteen (18) cars.

11. The City of Phoenix decided to construct the Project in three different stages.

12. "Stage 1" of the Project (the stage at issue in this matter) is approximately 1.7 miles long and involved designing, building, operating, and maintaining the PHX Sky Train System with three (3) stations to include the 44th Street METRO light rail station, the East Economy Lot parking facility, and Terminal 4 of the Sky Harbor Airport.

13. These three (3) stations serve approximately eighty percent (80%) of Sky Harbor Airport's passengers.

**B.     Bombardier Enters Into a Contract with CK for Civil Engineering Services.**

14. On or around September 17, 2009, Bombardier entered into a purchase order and contract with CK (the "CK Contract") for CK to perform certain civil engineering services for Stage 1 of the Project. (**Exhibit 1**, CK-Contract.)

15. Under the CK-Contract, CK agreed to provide, among other things, the designs, calculations, and drawings for the running surfaces and running surface expansion joints (including ride plates) for the Automated Guideway Transit System ("Guideway"), which is the surface upon which the eighteen (18) cars run. (**Exhibit 1**, CK-Contract, Purchase Order, Line 1., Description 2.c.)

16. The Guideway, which is integral to the PHX Sky Train System, includes three types of expansion joints: Type 1, Type 2, and Type 3. The expansion joints consist of thick steel ride plates (which the train cars drive on) that are anchored to the underlying concrete plinths.

17. The design and construction of the Guideway was an integral part of the Project.

18. In performing its work, CK agreed to, *inter alia*, "conform to the standard of care ordinarily used by a reasonably prudent engineering performing similar work under similar circumstances." (**Exhibit 1**, CK-Contract, § 21.A.)

### C. CK Enters Into a Subcontract with SGI.

19. On or around September 18, 2009, CK entered into a subcontract with SGI to perform certain calculations to be incorporated into CK's design work (the "CK-SGI Subcontract").

20. At all times, SGI knew that its work under the CK-SGI Subcontract would be incorporated into CK's final designs, and that CK's final designs would be provided to Bombardier for implementation on the Project.

### D. CK's and SGI's Negligent, Defective, and/or Incomplete Work.

21. On or around January 24, 2013, after the completion of a thirty (30) day system demonstration period and during a routine daily inspection, Bombardier discovered that one of the Guideway's Type 2 expansion joint concrete plinths had experienced a complete failure.

22. After further inspection of the other expansion joint locations on the Guideway, Bombardier discovered the failure of expansion joint concrete plinths at three (3) additional locations, including Type 2 and Type 3 expansion joints ("Original Failure(s)"). On all occasions, the concrete plinths failed causing the steel ride plates to dislodge from the corresponding concrete plinths resulting in the Original Failures.

23. Bombardier notified CK and SGI of the Original Failure the same day it was discovered and provided CK and SGI an opportunity to investigate and correct the problems associated with their work and original designs of the Guideway.

24. CK and SGI investigated the Original Failures and ultimately discovered and admitted that certain load distributions had not been taken into account in their original designs of the Guideway.

25. On February 6, 2013, CK and SGI submitted to Bombardier a retrofit plan (including calculations and drawings) for the entire Guideway that involved correcting the issues associated with the more than three hundred (300) Type 2 and Type 3 concrete plinths (the "Retrofit Plan").

26. Ultimately, on February 8, 2013, the City of Phoenix rejected the Retrofit Plan because, among other problems, it contained incorrect calculations and did not meet the required standards (including pertinent American Concrete Institute standards for design of reinforced concrete).

27. By letter dated February 26, 2013, Bombardier terminated the CK Contract for default. Among other things, the Termination Letter set forth Bombardier's intent to hold CK fully responsible for all damages incurred by Bombardier as a result of CK's negligent, defective, and/or incomplete work.

E. **Bombardier Engages HDR to Investigate and Permanently Correct the Expansion Joints to Eliminate Future Failures.**

28. On or about February 21, 2013, Bombardier engaged HDR under the parties' Master Services Agreement (the "HDR-MSA") and pursuant to Purchase Order No. 4500546120 (the "HDR-PO"). (**Exhibit 2**, HDR-MSA; **Exhibit 3**, HDR-PO.)

29. Under the HDR-PO, HDR agreed to, *inter alia*, investigate the Original Failures, perform an independent review of the original design provided by CK and SGI, and provide a new design and construction drawings for Type 2 and Type 3 expansion joint replacement, and oversee the construction of the new design provided by HDR. (**Exhibit 3**, HDR-PO, Tasks 1-6.)

30. In this regard, HDR understood that "[t]he elimination of potential future failures is paramount for the safe and uninterrupted service of the APM system for which [Bombardier is] well known." (**Exhibit 3**, HDR-PO, ¶ 1.)

31. In performing this work, HDR agreed to adhere to the standard of "care and skill ordinarily used by members of [HDR's] profession practicing under the same or similar circumstances at the same time and in the same locality." (**Exhibit 2**, HDR-MSA, ¶ 54.0.)

32. Further, HDR agreed to indemnify and hold Bombardier harmless from "[a]ll damages or liability . . . to the extent caused by any actual or alleged negligent act, error, or omissions of [HDR] . . . and arising out of the performance of professional

services[.]"  (**Exhibit 2**, HDR-MSA, ¶ 7.0.A.1.)

33. Thus, in accordance with its obligations under the HDR-PO, HDR performed an independent review of the original Guideway design provided by CK and SGI and investigated the Original Failures.

34. In addition to identifying other design deficiencies in CK's and SGI's work – namely, deficiencies in the design of the expansion joints on the Guideway – the HDR Investigation ultimately determined that the Original Failure occurred as a result of CK's defective design of the concrete plinths, which contained inaccurate assumptions of load distributions throughout the expansion joint assembly and plinth structural system.

35. As a result, HDR concluded that a retrofit was not feasible and that all of the existing Type 2 and Type 3 concrete plinths had to be demolished, redesigned, and reconstructed.  In addition, HDR determined that twelve (12) of the twenty-four (24) ride plates also needed to be demolished and replaced (the "HDR Plan").  However, HDR did not redesign the ride plates or anchoring studs themselves and instead, as discussed below, negligently adopted the same defective design originally implemented by CK and SGI.

36. Bombardier hired The Weitz Company ("Weitz") to construct the HDR Plan.

37. Ultimately, Weitz implemented the HDR Plan and Bombardier received its Certificate of Final Completion on July 31, 2013.

**F.** **Bombardier Initiates and Resolves Lawsuit Against CK and SGI Concerning CK's and SGI's Negligent, Defective, and/or Incomplete Design of the Expansion Joint Concrete Plinths.**

38. Following the Original Failures, Bombardier filed suit against CK and SGI in the United States District Court for the District of Arizona at Docket No. 2:14-cv-00876-PGR (the "Original Litigation").

39. The Original Litigation related exclusively to CK's and SGI's defective design of the expansion joint concrete plinths, and did not involve CK's and SGI's then-

unknown negligent, defective, and/or incomplete design of the expansion joint ride plate anchoring studs.

40. Bombardier, CK, and SGI entered a Notice of Settlement of the Original Litigation on or about August 26, 2015.

### G. **Bombardier Discovers Additional Failures Arising from New, Previously Undiscoverable Latent Defects in the Design of the Expansion Joint Ride Plates Anchoring Studs.**

41. Less than eight (8) years later, on September 4, 2020, a Type 3 expansion joint ride plate failure occurred. However, as opposed to the Original Failures, in this instance the ride plate anchoring studs failed, breaking apart from the concrete plinth and causing significant damage to the surrounding structure.

42. Following this failure, Bombardier immediately ceased operations of the PHX Sky Train System to investigate the failure and develop a solution.

43. The City of Phoenix engaged independent consultant Wiss, Janney, Elstner Associates, Inc. ("WJE") to investigate the failure.

44. Upon inspection, WJE found, *inter alia*, that the vertical anchoring studs that attach the ride plates to the concrete plinths exhibited fatigue cracking that propagated perpendicular to the travel direction of the train wheels. In addition, WJE found a distinct separation between the stud and the surrounding concrete to varying degrees around many of the vertical studs.

45. Thereafter, Bombardier retained Weitz to demolish and reconstruct the failed ride plate and concrete plinth.

46. Weitz completed its work and the PHX Sky Train became operational again on November 9, 2020.

47. Shortly thereafter, on January 24, 2021, four (4) additional Type 3 expansion joint ride plate failures were discovered (the September 4, 2020 and January 24, 2021 failures collectively referred to as the "Recent Failures").

48. Following the Recent Failures, Bombardier retained LPI, Inc. ("LPI") to determine the cause of the Recent Failures.

49. Similar to WJE's assessment, LPI concluded that the Recent Failures were caused by high fatigue stress at the stud-to-plate weldment produced by excessive local bending induced by vertical tire loading.

50. Furthermore, LPI concluded that the anchoring stud design—as issued by CK and SGI, and reviewed and re-issued by HDR—does not adequately resist the applied loading and longitudinal movement of the ride plate.

51. As a result of the Recent Failures, Bombardier engaged LPI to develop a redesign of the expansion joints to eliminate the localized fatigue cracking on the studs.

52. As a result of the Recent Failures, Bombardier has been unable to operate the PHX Sky Train at full capacity and has lost significant revenue and incurred substantial costs on its related Operations and Maintenance Contract with the City of Phoenix.

## COUNT I

### BREACH OF CONTRACT
**(Bombardier v. CK)**

53. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

54. Bombardier and CK entered into the CK Contract for CK to perform civil engineering work on the Project in return for remuneration in the amounts set forth in the Contract.

55. Bombardier performed all of its obligations under the CK Contract.

56. CK provided Bombardier with negligent, defective, and/or incomplete work, including but not limited to providing a defective expansion joint ride plate anchoring stud design for the Guideway.

57. In providing negligent, defective, and/or incomplete work, CK breached Section 7.0(A), 21.0(A), and 54.0 of the CK Contract and caused Bombardier significant

harm and damage.

**WHEREFORE,** Plaintiff Bombardier respectfully requests that this Court enter judgment in its favor and against CK awarding compensatory damages to be determined at trial, plus interest, costs, and attorneys' fees (pursuant to Section 7.0(A) of the BT-CK Contract and/or A.R.S. § 12-341.01), together with any further and additional relief that this Court may deem just and proper.

## COUNT II
### NEGLIGENCE
### (Bombardier v. SGI)

58. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

59. As a result of entering into the SGI Subcontract and performing its work on the Project, SGI owed Bombardier a duty to use ordinary skill, care, and diligence in rendering its professional services on the Project.

60. SGI failed to exercise the ordinary skill, care, and diligence that a reasonable design professional would have exercised by providing CK and Bombardier with inadequate calculations and designs.

61. SGI's inadequate calculations and designs caused a defect in the Type 2 and Type 3 expansion joint anchoring studs on the Guideway. SGI's breach of the duty owed to Bombardier caused Bombardier significant harm and damage.

**WHEREFORE,** Plaintiff Bombardier respectfully requests that this Court enter judgment in its favor and against SGI awarding compensatory damages to be determined at trial, plus interest and costs, together with any further and additional relief that this Court may deem just and proper.

## COUNT III

### BREACH OF IMPLIED WARRANTY
### (Bombardier v. SGI)

62. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

63. By performing work on the Project and under the SGI Subcontract, SGI warranted that it would exercise its skills with care and diligence and in a reasonable, non-negligent manner.

64. At all times, SGI knew that its work under the SGI Subcontract would be incorporated into CK's final designs, and that CK's final designs would be provided to Bombardier for implementation on the Project.

65. As a result of exercising its skills and providing incorrect calculations in an unreasonable and negligent manner, SGI breached its warranty that it would exercise its skills with care and diligence and in a reasonable, non-negligent manner.

66. Bombardier relied to its detriment on SGI's incorrect calculations.

67. As a direct result of SGI's breach of its implied warranty, Bombardier sustained significant harm and damage.

**WHEREFORE**, Plaintiff Bombardier respectfully requests that this Court enter judgment in its favor and against SGI awarding compensatory damages to be determined at trial, plus interest and costs, together with any further and additional relief that this Court may deem just and proper.

## COUNT IV

### BREACH OF CONTRACT
### (Bombardier v. HDR)

68. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

69. Bombardier and HDR entered into the HDR Contract for HDR to investigate the Original Failures, review the original expansion joint design supplied by

- 10 -

1   CK and SGI, and develop a solution to remedy the Original Failures.

2   70.   Bombardier performed all of its obligations under the HDR Contract.

3   71.   HDR provided Bombardier with negligent, defective and/or incomplete work, including but not limited to providing a defective expansion joint ride plate anchoring stud design for the Guideway.

72.   In providing negligent, defective and/or incomplete construction work, HDR has breached the HDR Contract, including but not limited to the provision of the HDR Contract providing that "[t]he standard of care for all professional engineering, consulting and related services performed or furnished by [HDR] and its employees under this Agreement will be the care and skill ordinarily used by members of [HDR's] profession practicing under the same or similar circumstances at the same time and in the same locality." (See Exhibit 2, HDR Contract, § 54.0).

73.   Moreover, in performing its work, HDR failed to consider the effect that redesigning the concrete plinths would have on the integrity of the ride plate anchoring studs.

74.   In providing negligent, defective and/or incomplete construction work, HDR has caused Bombardier significant harm and damage.

**WHEREFORE**, Plaintiff Bombardier respectfully requests that this Court enter judgment in its favor and against HDR awarding compensatory damages to be determined at trial, plus interest, costs, and attorneys' fees (pursuant to A.R.S. § 12-341.01), together with any further and additional relief that this Court may deem just and proper.

**ARIZ. REV. STAT. § 12-2602 CERTIFICATION**

75.   Pursuant to Ariz. Rev. Stat. § 12-2602, the undersigned counsel hereby certifies that this Complaint includes claims against a licensed professional and that expert opinion testimony is necessary to prove the licensed professional's applicable standard of care or liability for the claim.

## PRAYER FOR RELIEF

76. WHEREFORE, Bombardier prays for the following relief:

(a) compensatory damages greater than $75,000, together with pre judgment and post judgment interest and attorneys' fees and costs; and

(b) any further relief that this Court deems necessary, proper, and just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Bombardier hereby demands a trial by jury on all issues triable of right by a jury.

DATED this 23rd day of August, 2021.

SNELL & WILMER L.L.P.

By */s/ Jason Ebe*
Jason Ebe
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Attorneys for Bombardier Transportation
(Holdings) USA Inc.

- 12 -