Jason Ebe (#017216)
Creighton P. Dixon (#033298)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail:      jebe@swlaw.com
             cdixon@swlaw.com

Jason L. Richey (Admitted Pro Hac Vice)
Jason.Richey@klgates.com
Talor I. Bearman (Admitted Pro Hac Vice)
Talor.Bearman@klgates.com
Justin N. Leonelli (Admitted Pro Hac Vice)
Justin.Leonelli@klgates.com
K&L GATES, LLP
210 Sixth Avenue
Pittsburgh, PA 15222

*Attorneys for Bombardier Transportation*
*(Holdings) USA Inc*

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bombardier Transportation (Holdings) USA Inc., | Case No. 2:21-CV-1460-PHX-SPL |
| Plaintiff, | |
| v. | **PLAINTIFF BOMBARDIER TRANSPORTATION (HOLDINGS) USA INC.'S SEPARATE CONTROVERTING AND SUPPLEMENTAL STATEMENT OF FACTS IN SUPPORT OF OPPOSITION TO HDR'S MOTION FOR SUMMARY JUDGMENT** |
| HDR Engineering, Inc. and Structural Grace, Inc. | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff Bombardier Transportation (Holdings) USA Inc. ("Bombardier") submits this Separate Controverting and Supplemental Statement of Facts ("CSOF") in Support of its Opposition to Defendant HDR Engineering, Inc.'s ("HDR") Motion for Summary Judgment (the "Motion").

## I.   RESPONSE TO HDR'S SEPARATE STATEMENT OF FACTS

Paragraphs 1 - 52 below correspond to the numbered paragraphs in HDR's Separate Statement of Facts ("SOF") in Support of its Motion.  Pursuant to the Court's Case Management

Order, HDR's SOF is contained herein.  Bombardier objects to HDR's numerous violations of L.R. 56.1(a), by combining multiple alleged facts into one numbered paragraph.  Where possible, Bombardier has attempted to separate the alleged facts and respond accordingly.

1.     Bombardier contracted with the City of Phoenix to design and build the Phoenix Sky Harbor International Airport PHX Sky Train System ("Sky Train"), and separately to operate and maintain the Sky Train. (Ex. A, City of Phoenix/Bombardier Design & Build Contract; Ex. B, Operations & Maintenance Contract.)

**RESPONSE:     UNDISPUTED.**

2.     The Operations & Maintenance Contract began on April 1, 2013 and will extend to 2033. (Ex. B at 2.)  For its role operating and maintaining the Sky Train, Bombardier receives monthly payments which are "prorated for the number of days in the month that the System is actually operated." (Ex. B at 88.)   Bombardier is responsible for the cost of performing "preventative, corrective, and major maintenance on [Sky Train] System components; and replacement of parts for the System." (*Id.* at 51.)

Allegation 1: "The Operations & Maintenance Contract began on April 1, 2013 and will extend to 2033. (Ex. B at 2.)"

**RESPONSE:     UNDISPUTED.**

Allegation 2:  "For its role operating and maintaining the Sky Train, Bombardier receives monthly payments which are "prorated for the number of days in the month that the System is actually operated." (Ex. B at 88.)"

**RESPONSE:     DISPUTED.  Bombardier is paid an average monthly payment "equal to one-twelfth (1/12) of the annual Contract Price for the current year of the [Operations & Maintenance Contract] [. . .] multiplied by the appropriate Operations payment factor from OMSP Table B.2.-1." (Doc. 153-3, Ex. B at 19-20.[1])  The average monthly payment is only "prorated for the number of days in the month that the**

---

[1] All references to page numbers refer to the ECF-stamped page number.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**System is actually operated," for "any partial month."  According to the OMSP Table, Bombardier does not receive any payment for a month in which the system availability falls below 90%.  (Doc. 153-3, Ex. B at 19-20.)**

Allegation 3: "Bombardier is responsible for the cost of performing 'preventative, corrective, and major maintenance on [Sky Train] System components; and replacement of parts for the System.' (*Id.* at 51.)"

**RESPONSE:      DISPUTED.  In addition to the costs HDR cites, Bombardier is responsible for the cost of repair or replacement for all damaged parts, components or materials that are covered by its Design-Build warranty, or as required to meet any Design-Build Contract requirements which were not discovered during the design-build phase.  (*See* Doc. 153-3, Ex. B at 48.)**

3.      The Sky Train is an automated rail system transporting people via driverless trains on a center-rail guideway supported by reinforced concrete plinths. (Ex. C, Am. Compl. ¶¶ 8-10; 14-15.)  A portion of the guideway supported by plinths is shown here.



(Ex. D., IMG_0686, City of Phoenix Resp. to Sub; *see also* Ex. CC, Van Dien Decl. at ¶ 5.)

**RESPONSE:      UNDISPUTED.**

4.      Bombardier contracted with the CK Group, Inc. ("CK") to provide designs, calculations, and drawings for the running surfaces and expansion joints of the center-rail

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

guideway, including the concrete plinths and the ride plates. (Ex. C at ¶¶ 13-14.)  CK, in turn, contracted with Structural Grace, Incorporated ("SGI") to perform certain calculations which were incorporated into CK's design work, including for the concrete plinths and ride. (*Id.* ¶ 18.)

**RESPONSE:**     **UNDISPUTED.**

5.     Where the concrete plinths support the center-rail guideway, the plinths include expansion joints to accommodate thermal movements in the supporting structures. (Ex. E, July 29, 2022 Rep. of R. Poston at 2.)

**RESPONSE:**     **DISPUTED.  The concrete plinths are part of the expansion joints, along with the steel ride plates and the steel anchors.  (*See* Doc. 105, ¶ 15; *see* CSOF at ¶ 55.)**

6.     Several types of expansion joints were used on the Sky Train project. (Ex. E at 2; Ex. C at ¶ 15.)  Each type accommodates different anticipated joint movements. (Ex. E at 2.)   Type 2 and 3 expansion joints have cantilevering ride plate assemblies (right). (*Id.*)



Figure 1: Typical Type 3 expansion joint in service. Background image was extracted from Figure 3-11 of the SOCOTEC March 2022 report. Annotations were added by Pivot.

Allegation 1:  "Several types of expansion joints were used on the Sky Train project. (Ex. E at 2; Ex. C at ¶ 15.)"

**RESPONSE:**     **UNDISPUTED.**

Allegation 2:  "Each type accommodates different anticipated joint movements. (Ex. E at 2.)"

**RESPONSE:**     **UNDISPUTED**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Allegation 3:  "Type 2 and 3 expansion joints have cantilevering ride plate assemblies

2  (right). (*Id.*)"

3  **RESPONSE:   DISPUTED.  The Type 2, 3, 4, and 5 expansion joints all have**

4  **cantilevering ride plate assemblies.  (*See* CSOF at ¶ 61.)**

5

6      7.      The ride plate is a piece of 1.25" cantilever steel extending over the expansion joint

7  gap.  The ride plate is welded to a vertical end

8  plate and anchored to the concrete plinth below

9  via vertical and horizontal shear studs, which are

10  imbedded in the concrete and welded to the ride plate

11  (right). (*Id.*; image from Ex. F, May 7, 2021 Rep. of

12  R. Vecchio at 5, text added.)  The guideway running

13  surfaces, including the expansion joints, have a design

14  life of thirty years. (Ex. G-2, App'x B. to March 28,

15  2013 Root Cause Rep. at 34.)

16  Allegation 1:  "The ride plate is a piece of 1.25" cantilever steel extending over the

17  expansion joint gap."

18  **RESPONSE:   DISPUTED.  The thickness of the steel is 1.25", the length of the**

19  **cantilever is not 1.25".  (*See* Doc. 153-7, Ex. E at 2.)**

20

21  Allegation 2:  "The ride plate is welded to a vertical end plate and anchored to the concrete

22  plinth below via vertical and horizontal shear studs, which are imbedded in the concrete

23  and welded to the ride plate (right). (*Id.*; image from Ex. F, May 7, 2021 Rep. of R. Vecchio

24  at 5, text added.)"

25  **RESPONSE:   UNDISPUTED.**

26

27  Allegation 3:  "The guideway running surfaces, including the expansion joints, have a

28  design life of thirty years. (Ex. G-2, App'x B. to March 28, 2013 Root Cause Rep. at 34.)"

1    **RESPONSE:         DISPUTED.  The design life of the expansion joints is *not less than***

2    **thirty (30) years.  (Doc. 154-3, Ex. G-2 at 34; *see also* Dep. of Robert Vecchio, Doc.**

3    **156-7, Ex. X at 69:18-70:10.)  The design criteria also states:**

4    **"Unless otherwise stated in the Owners [sic] specifications, the guideway structure**

5    **should be designed in accordance with the latest "Standard Specifications for**

6    **Highway Bridges," adopted by the American Association of State Highway and**

7    **Transportation Officials.  Specifications that may also apply to guideway design may**

8    **be taken from the following publications, including interim revisions or as modified**

9    **in this document.  In all cases, the most recent version of each publication shall be**

10   **used, unless specifically identified in the Owner's contract documents.  The basis of**

11   **the design requirements is normally a 50 year service life."  (*Id.* at 24.)**

12

13   8.      In January 2013, Bombardier discovered concrete plinths at four Type 2 and Type

14   3 expansion joints ("2013 Concrete Failures") had failed.  Where the concrete plinths failed, the

15   ride plates dislodged from the corresponding plinths. (Ex. C at ¶¶ 21-22.)

16   **RESPONSE:         UNDISPUTED.**

17

18   9.      On January 28, 2013, Bombardier contacted HDR for assistance under a 2012

19   extension to a 2002 Master Services Agreement ("MSA") analyzing the concrete plinth failures.

20   (Ex. H, Jan. 28, 2013 Retention Email; Ex. I, 2002 MSA & Extension.)  Bombardier asked HDR

21   to "[p]erform an independent review of the nominal design configuration," and "write a report,"

22   to be started "immediately and complet[ed] … as quickly as possible." (Ex. H at 1.)

23   Allegation 1:  "On January 28, 2013, Bombardier contacted HDR for assistance under a

24   2012 extension to a 2002 Master Services Agreement ("MSA") analyzing the concrete

25   plinth failures. (Ex. H, Jan. 28, 2013 Retention Email; Ex. I, 2002 MSA & Extension.)"

26   **RESPONSE:         DISPUTED.  On January 28, 2013, Bombardier contacted HDR for**

27   **assistance under a 2012 extension to a 2002 MSA to perform "an independent review**

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**of the PHX ride plate design." (*See* Doc. 155-1, Ex. H; *see also* Dep. of John Galanko, Doc. 156-5, Ex. V at 124:8-21; 128:4-14; *see also* CSOF at ¶ 60.)**

Allegation 2:   "Bombardier asked HDR to "[p]erform an independent review of the nominal design configuration," and "write a report," to be started "immediately and complet[ed] … as quickly as possible." (Ex. H at 1.)"

**RESPONSE:     DISPUTED.     HDR's selective quotations omit the operative information regarding the basis for the review.  Bombardier's email requests HDR "[p]erform an independent review of the nominal design configuration *as reflected on the relevant sheets of the PHX guideway design plan sets* and write a report." (Doc. 155-1, Ex. H; *see also* Dep. of John Galanko, Doc. 156-5, Ex. V at 124:8-126:4; CSOF ¶ 60.)  The relevant sheets of the design plan sets included the "Running Surface Detail Sheets RS04-001 thru RS04-007," which encompassed the design of details for the entire expansion joint system, including the ride plates and ride plate studs.  (*See* CSOF ¶ 61.)**

10.     The MSA was executed in Pennsylvania. (Ex. CC at ¶ 11.)   It contains a Pennsylvania choice of law provision. (Ex. I at § 37.0.)  Section 55 of the MSA provides that "no provisions extend the duties or liabilities of SUBCONTRACTOR [*i.e.,* HDR] beyond those set forth in this Agreement." (*Id.* at § 55.0.)  Further, HDR 'shall not be responsible for the acts or omissions of the contractor or other parties on the project." (*Id.*)  Section 56.0 of the MSA provides HDR's "review or approval of a specific item shall not indicate approval of an assembly of which the item is a component." (*Id.* at § 56.0.)

**RESPONSE: UNDISPUTED.**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11.    On January 30, 2013, Bombardier sent five photos of failed concrete plinths and asked HDR to "review both the Type 2 and Type 3 plates." (Ex. J, Jan. 30, 2013 Email from J. Galanko to M. Pavlick, et al.)



Failed concrete plinth

**RESPONSE:    DISPUTED.    Although HDR refers to the photos as photos of "failed concrete plinths," the email only refers to ride plate failures.  The email, with the Subject "RE: PHX Ride Plate Photos," states: "Attached are photos that we received last week, of the worst five (5) *ride plate failures* surfaced during a close visual inspection of 100% of the ride plates on the system."  (*See* Dep. of John Galanko, Doc. 156-5, Ex. V at 121:15-122:3; *see also* Doc. 155-3, Ex. J. at 2.)**

12.    The City of Phoenix engaged engineering firm Wiss, Janney, Elstner Associates ("WJE") for technical consulting. (Ex. K, A. Kurtenbach dep. tr. at 41:18-20, 52-53, 65:16-20.)

**RESPONSE:    DISPUTED.  The cited deposition testimony states that the City of Phoenix "do[es] not have a contract" with WJE.  Instead the City of Phoenix "task order[s] for their service."  (Doc. 155-4, Ex. K at 41:1-20.)**

13.    Bombardier retained AMEC Environment & Infrastructure, Inc., ATA Engineering ("ATA"), and the Weitz Group ("Weitz") to inspect the 2013 failures.  (Ex. G-7, App'x G to RC Rep. at 1; Ex. G-9 App'x I to RC Rep. at Abstract; Ex. L, Feb. 7, 2013 Email from J. Galanko to J. VanDien, et al, and attached METL Rep. at pdf4.).  Weitz retained Metals Engineering and Testing Laboratories ("METL") for metallurgical testing. (Ex. L. at pdf 2, 5). Bombardier emailed the METL Report to HDR. (*Id.* at pdf 2.)

**RESPONSE:    UNDISPUTED.**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1 | 14.   METL performed a metallurgical assessment of a shear stud recovered from the
2 | first ride plate, (*Id.* at pdf 5.), and determined the stud experienced a "rapid failure," as opposed to
3 | a fatigue failure over time; the stud had fractured at the weld point due to sudden shear-induced
4 | failure of the concrete plinths. (*Id.* at 17.)   The "fracture initiated within the heat affected zone
5 | from the weld joining the stud to the plate," and it "is possible that residual stresses from the
6 | heating/cooling of the stud during weld[ing] led to initiation in this location." (*Id.*)

7 | Allegation 1:  "METL performed a metallurgical assessment of a shear stud recovered from
8 | the first ride plate, (*Id.* at pdf 5.), and determined the stud experienced a 'rapid failure,' as
9 | opposed to a fatigue failure over time; the stud had fractured at the weld point due to sudden
10 | shear-induced failure of the concrete plinths. (*Id.* at 17.)"

11 | **RESPONSE:      DISPUTED.   The cited report does state that the fracture "is**
12 | **indicative of a rapid failure." (Doc. 155-5, Ex. L at 21.)  However, the report does not**
13 | **ever mention "fatigue," or that the failure was rapid as opposed to a fatigue failure.**
14 | **(*See* Doc. 155-5, Ex. L.)  In fact, during the deposition of Adam Haskins, the author**
15 | **of the report, Mr. Haskins testified that rapid failures and fatigue failures are not**
16 | **mutually exclusive.  (Dep. of Adam Haskins, Doc. 155-5, Ex. M at 79:12-17 ("Yes, you**
17 | **can have a fatigue failure be rapid if it's, say, either a low cycle or high cycle fatigue**
18 | **failure in something that experiences a lot of cycles very quickly, like vibration.").)**
19 | **Additionally, the report makes no mention of a "sudden shear-induced failure of the**
20 | **concrete plinths."  (*See* Doc. 155-5, Ex. L.)  METL suggested that the "fracture**
21 | **appears to have progressed directly across the diameter of the stud via transgranular**
22 | **cleavage." (Doc. 155-5, Ex. L at 21.)**

24 | Allegation 2:  "The 'fracture initiated within the heat affected zone from the weld joining
25 | the stud to the plate,' and it 'is possible that residual stresses from the heating/cooling of
26 | the stud during weld[ing] led to initiation in this location.' (*Id.*)"
27 | **RESPONSE:      UNDISPUTED.**

15.     METL representative Adam Haskins testified the welds, rather than the studs, may have led to the shear stud failure.

> Q.   So that was a possibility that you noted that it was the welding process
>       Itself that led to the initiation at this location?
> A.   A possibility, yes.
> Q.   And you found no obvious material defects in the stud sample; correct?
> A.   Not that I recall and not that is documented here.

(Ex. M, A. Haskins dep tr. at 73:24-74:6.)

**RESPONSE:     UNDISPUTED.**


16.     On February 1, 2013, Bombardier asked HDR to revise HDR's independent design review to "consider and account for the affect of tractive effort forces acting in conjunction with vertical tire load forces," and to develop designs for "minimal impact" repairs. (Ex. N, Feb 1, 2013 email from J. Galanko to J. VanDien.)

**RESPONSE:     UNDISPUTED.**


17.     On February 15, 2013, Bombardier representative Rob DeCostro emailed HDR representative Mark Pavlick, stating: "We appreciate everything over the last week.  [Gr]eat work to you and the HDR team!!!!" (Ex. O, Feb. 15, 2013 email from R. DeCostro to M. Pavlick.)  He also stated: "Our cu[s]tomer [the City of Phoenix] is going to require a consolidated root cause report with a final solution.  I believe you and your team already have everything for this report, we will need it to be in one document." (*Id.*)

**RESPONSE:     UNDISPUTED.**


18.     On February 21, 2013, HDR provided Bombardier with a "revised proposal to capture the work in response" to Bombardier's January 28, 2013 retention email. (Ex. P, Feb. 21, 2013 proposal ltr. at 1.)  HDR stated: "[t]he design and construction services provided by HDR are in response to the ***failure of the anchorage*** of five running plinth expansion joint plates" (*i.e.,* the concrete plinths).  (*Id.,* emphasis added.)  Under Task 1, HDR offered to "perform an

independent review of the original design provided by [CK and SGI];" this review "will be for the Type 2 and Type 3 running *plinth* expansion joints." (*Id.*, emphasis added.)

Allegation 1:  "On February 21, 2013, HDR provided Bombardier with a "revised proposal to capture the work in response" to Bombardier's January 28, 2013 retention email. (Ex. P, Feb. 21, 2013 proposal ltr. at 1.)"

**RESPONSE:      UNDISPUTED.**

Allegation 2:  "HDR stated: '[t]he design and construction services provided by HDR are in response to the *failure of the anchorage* of five running plinth expansion joint plates' (*i.e.,* the concrete plinths) (*Id.,* emphasis added.)."

**RESPONSE:       DISPUTED.  Bombardier disputes HDR's characterization of "the anchorage of five running plinth expansion joint plates," as "the concrete plinths." (*See* CSOF ¶ 53.)**

Allegation 3:  "Under Task 1, HDR offered to "perform an independent review of the original design provided by [CK and SGI];" this review "will be for the Type 2 and Type 3 running *plinth* expansion joints." (*Id.*, emphasis added.)"

**RESPONSE:      UNDISPUTED.**

19.    On February 19, 2013, Bombardier noted that "Tasks 1 and 2 are essentially complete." (Ex. Q, Feb. 19, 2013 email from M. Pavlick to R. DeCostro at 1.)

**RESPONSE:       DISPUTED. Bombardier disputes that "Tasks 1 and 2" referenced in the cited email are references to the text in HDR's February 21, 2013 proposal. The email references an attached proposal with the title "Sky_Harbor_Ltr_2-19-13.pdf."  (Doc. 155-10, Ex. Q at 2.)**

20.     A February 19, 2013 email from Douglas Heitzenrater in response to a draft Revised Proposal asked questions only about Tasks 4 and 6. (Ex. R, Feb. 19, 2013 email from D. Heitzenrater to R. DeCostro.)

**RESPONSE:        DISPUTED.  The cited email states that it was seeking comments in response to a "quote from HDR," it does not mention a "draft Revised Proposal," nor does it indicate any attachments.  (*See* Doc. 156-1, Ex. R.)**

21.     Douglas Heitzenrater, an Engineering Manager at Bombardier, testified he was concerned about fatigue life of the anchor studs.

I'm saying basically, you've got to. . . calculate the weight and the number of bags on the train to know what the total weight of the train was whenever it passed over the plates to know that it was not in excess, and then equate that weight to the number of -- take the weight and the number of cycles that you passed at over a plate to -- *what I was driving at was a fatigue situation*.

(Ex. S, D. Heitzenrater dep. tr. at 104:19-105:1, emphasis added.)

**RESPONSE:        DISPUTED.  Mr. Heitzenrater's comments were directed to the fatigue life of the entire Sky Train system, not merely the anchor studs.  (*See* CSOF ¶¶ 92-95.)  Contrary to HDR's introductory sentence, Mr. Heitzenrater's testimony was not limited to the anchor studs.  (*See id.*)**

22.     Heitzenrater was concerned about the fatigue of the anchor studs and raised this concern "for somebody [at Bombardier] to respond, for somebody that had that information to respond," and "[t]o inject it into the effort." (Ex. S at 107:7-13.)  He further testified:

Q.  And did you make any specific request to anyone at Bombardier or HDR
     To do further analysis regarding the fatigue of the anchor studs?
A.  I don't recall that.
Q.  You don't recall doing such a thing?
A.  I don't recall requesting it.
Q.  Okay.  Did anyone else request it?
A.  I don't recall.

(*Id.* at 117:17-24.)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Allegation 1: "Heitzenrater was concerned about the fatigue of the anchor studs and raised this concern "for somebody [at Bombardier] to respond, for somebody that had that information to respond," and "[t]o inject it into the effort." (Ex. S at 107:7-13.)"

**RESPONSE:** **DISPUTED. Mr. Heitzenrater's comments were not raised for "somebody at Bombardier to respond," as HDR suggests. (Doc. 156-2, Ex. S at 107:7-11.) Mr. Heitzenrater testified that he raised the concern "for somebody to respond, for somebody that had that information to respond to." (*Id.*) Mr. Hetizenrater's email was not sent only to Bombardier, it was also sent to multiple members of HDR. (Doc. 156-3, Ex. T at 2; *see also* CSOF ¶ 92.) Additionally, Mr. Heitzenrater's testimony was not limited to the anchor studs. In the selected portion of Mr. Heitzenrater's testimony, he is referring to the fatigue assessment of the entire Sky Train system. (Doc. 156-2, Ex. S at 107:7-13; *see also* Doug Heitzenrater, Ex. 1 at ¶¶9-12.)**

Allegation 2: "He further testified:

> Q. And did you make any specific request to anyone at Bombardier or HDR to do further analysis regarding the fatigue of the anchor studs?
> A. I don't recall that.
> Q. You don't recall doing such a thing?
> A. I don't recall requesting it.
> Q. Okay. Did anyone else request it?
> A. I don't recall.

 (*Id.* at 117:17-24.)"

**RESPONSE: UNDISPUTED.**

23.     Heitzenrater also expressed his metal fatigue concerns by emailing DeCostro about the effect of weight loads on expansion plates. (Ex. T, Mar. 28, 2013 email from D. Heitzenrater to R. DeCostro.)  He testified:

Q. In your email back to the folks at Bombardier...in review of the HDR report, ***were you concerned about fatigue life of the anchor studs***?

A.  I was.

(*Id.* at 117:8-12.) (emphasis added)).

Allegation  1:   "Heitzenrater  also  expressed  his  metal  fatigue  concerns  by  emailing DeCostro about the effect of weight loads on expansion plates. (Ex. T, Mar. 28, 2013 email from D. Heitzenrater to R. DeCostro.)"

**RESPONSE:     DISPUTED.   Mr. Heitzenrater's email does not mention metal fatigue.  (Doc. 156-3, Ex. T.)   Furthermore, Mr. Heitzenrater's concern was that "HDR should consider this information in performing its failure root cause analysis because it can be used to evaluate the fatigue life of the entire PHX Sky Train System."  (Doug Heitzenrater, Ex. 1 at ¶10; *see also* Dep. of Doug Heitzenrater, Doc. 156-2, Ex. S at 117:13-16.)**

Allegation 2:  He testified:

> Q. In your email back to the folks at Bombardier...in review of the HDR report, *were you concerned about fatigue life of the anchor studs*?
>
> A.  I was.

(*Id.* at 117:8-12. (emphasis added)).

**RESPONSE:  DISPUTED.  Bombardier disputes that Mr. Heitzenrater's email was limited to the fatigue life of the anchor studs.  Mr. Heitzenrater's email was directed to "evaluate the fatigue life of the entire PHX Sky Train System, including all components of the expansion joint ride plate system."  (Doug Heitzenrater, Ex. 1 at ¶10.)**

24.     "Heitzenrater testified:

> Q.  Did anybody provide photographs of the fracturing concrete in 2013 to you?
> A.  Yes.

***

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Q.   Would you be able to look at the metallurgical report with the photographs and reach your own conclusions about what the mechanism of failure was?

A.   Possibly. . . .

(Ex. S at 73:11-13 and 84:20-24.)

**RESPONSE: DISPUTED.   Bombardier disputes any implication that Mr. Heitzenrater received the photographs from the metallurgical report in 2013.  The photographs of fractured concrete referenced in the first quote are different photographs from the photographs in the metallurgical report referenced in the second quotation.  (*See* Dep. of Doug Heitzenrater, Doc. 156-2, Ex. S at 73:11-13; 84:20-24.)**

25.    On February 26, 2013, Bombardier sent HDR a Purchase Order ("P.O.") to capture work already completed. (Ex. U, HDR Purchase Order and Change Orders.)[2]  This P.O. states: "This effort is for the Type 2 and Type 3 running plinth expansion joints installed for the PHX Sky Train system." (*Id.* at 1.)  Of the six enumerated tasks, only Tasks 1 and 2 are relevant to this suit. Task 1, CK Group/SGI Design and Retrofit Review (cost $13,700), was an "independent review of the original design provided by [CK/SGI]," along with reviewing and developing retrofit options. (*Id.* at 2.)  Task 2, Development of Retrofit/Replacement Options (cost $25,700), was to "develop Type 2 and Type 3 running plinth expansion joint retrofit/replacement options" in coordination with Bombardier, the City, and WJE. (*Id.* at 3.)

Allegation 1:        "On February 26, 2013, Bombardier sent HDR a Purchase Order ("P.O.") to capture work already completed. (Ex. U, HDR Purchase Order and Change Orders.)"

**RESPONSE:        DISPUTED.  The February 26, 2013 Purchase Order incorporates both work that HDR had begun, work HDR was still working on, and work that HDR had not yet begun.  For example, HDR issued its report on its independent review of**

---

[2] An April 11, 2013 Change Order amended Task 1 to compensate HDR for "performing anchorage checks."   HDR's "review or approval of a specific item shall not indicate approval of an assembly of which the item is a component." (Ex. I at § 56.0.)  Anchorage checks do not correspond to Type 2 or 3 expansion joints. (Ex. CC at ¶ 13.)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

the ride plates on February 1, 2013 (*see* CSOF ¶ 66); the Task 4, "Joint Failure Report," was not issued until March 28, 2013 (Doc. 154-1, Ex. G); and Task 6, "Construction Inspection," had not yet begun on February 26 (*see* Doc. 156-4, Ex. U).

Allegation 2:        "This P.O. states: 'This effort is for the Type 2 and Type 3 running plinth expansion joints installed for the PHX Sky Train system.' (*Id.* at 1.)"

**RESPONSE:        UNDISPUTED.**

Allegation 3:        "Of the six enumerated tasks, only Tasks 1 and 2 are relevant to this suit."

**RESPONSE:        DISPUTED.  Task 3 and Task 4 are also relevant to Bombardier's claims.  (*See* Doc. 156-4, Ex. U; *see also* Doc. 105 at ¶¶ 74-80.)**

Allegation 4:        "Task 1, CK Group/SGI Design and Retrofit Review (cost $13,700), was an "independent review of the original design provided by [CK/SGI]," along with reviewing and developing retrofit options. (*Id.* at 2.)"

**RESPONSE:        UNDISPUTED.**

Allegation 5:        "Task 2, Development of Retrofit/Replacement Options (cost $25,700), was to "develop Type 2 and Type 3 running plinth expansion joint retrofit/replacement options" in coordination with Bombardier, the City, and WJE. (*Id.* at 3.)"

**RESPONSE:        UNDISPUTED.**

Allegation 6:        "An April 11, 2013 Change Order amended Task 1 to compensate HDR for "performing anchorage checks.""

**RESPONSE:        DISPUTED.  HDR does not include any citation to the record in support of this alleged fact.  The April 11, 2013 Change Order amended Task 2 and Task 4, not Task 1.  (*See* Ex. 2.)  The Change Order was issued to "compensate HDR**

**for performing additional anchorage checks for the Abutment 2, Abutment 3, Abutment 4 and the Abutment Deck expansion joint ride plate anchorages all in accordance with Reference 1."** (*Id.*)   **The Change Order was also issued to "compensate HDR for the collection, review and presentation of additional information beyond that anticipated during the development of the Joint Failure Report to present the root cause of failure for the ride plate anchorages for the Type 2 and Type 3 Running Plinth Expansion Joints all in accordance with Reference 1."** (*Id.*)

Allegation 7:  "HDR's 'review or approval of a specific item shall not indicate approval of an assembly of which the item is a component.' (Ex. I at § 56.0.)"

**RESPONSE:**      **UNDISPUTED that this a provision of HDR's MSA.**

Allegation 8:  "Anchorage checks do not correspond to Type 2 or 3 expansion joints. (Ex. CC at ¶ 13.)"

**RESPONSE:**      **DISPUTED.   The Change Order specifically states that the anchorage checks are for the "expansion joint ride plate anchorages."** (*See* **Ex. 2.)**

26.      Pursuant to their agreement, HDR prepared a consensus Root Cause Report dated March 28, 2013 detailing the conclusions of the consortium of investigating engineers--including City of Phoenix representatives, Bombardier, HDR, WJE, METL, and ATA--concluding that CK/SGI's original design was "deficient" due to "inaccurate and unconservative assumptions of the distribution of the loads throughout the expansion joint assembly and plinth structural system." (Ex. G, March 28, 2013 Consensus Root Cause Report at 3, 12.)  The deficient "original design" caused the "failure of the expansion joints." (*Id.* at 12)  The Root Cause Report attached as appendices the AMEC Concrete Investigation, ATA Strain Gage, and METL Metallurgical reports. (Ex. G-7, App'x G to RC Report; Ex. G-8, App'x H to RC Report; Ex. G-9, App'x I to RC Report.)

1   <u>Allegation 1</u>:      "Pursuant to their agreement, HDR prepared a consensus Root Cause

2   Report dated March 28, 2013 detailing the conclusions of the consortium of investigating

3   engineers--including City of Phoenix representatives, Bombardier, HDR, WJE, METL,

4   and ATA--concluding that CK/SGI's original design was "deficient" due to "inaccurate

5   and unconservative assumptions of the distribution of the loads throughout the expansion

6   joint assembly and plinth structural system." (Ex. G, March 28, 2013 Consensus Root

7   Cause Report at 3, 12.)"

8   **RESPONSE:      DISPUTED.  Bombardier disputes that the Root Cause Report**

9   **reflects the conclusions of any entity other than HDR.  (*See* Doc. 156-4, Ex. U at 4**

10  **(Task 4 requests HDR "prepare a report that defines the root cause of the Type 2 and**

11  **Type 3 running plinth expansion joint failures.").)  Bombardier does not dispute that**

12  **HDR relied upon the work of others to create the Root Cause Report, but the**

13  **conclusions contained therein are the conclusions of HDR.  (*See* Doc. 154-1, Ex. G at**

14  **13 ("Based on the investigations previously described, along with HDR's review of**

15  **independent calculations prepared by WJE, which corroborate HDR's findings, *it is***

16  ***the opinion of HDR* that the failure is due to [. . .] inaccurate and unconservative**

17  **assumptions of the distribution of the loads throughout the expansion joint assembly**

18  **and plinth structural system.").)**

19

20  <u>Allegation 2</u>:      "The deficient 'original design' caused the 'failure of the expansion

21  joints.' (*Id.* at 12)"

22  **RESPONSE:      UNDISPUTED.**

23

24  <u>Allegation 3</u>:      "The Root Cause Report attached as appendices the AMEC Concrete

25  Investigation, ATA Strain Gage, and METL Metallurgical reports. (Ex. G-7, App'x G to

26  RC Report; Ex. G-8, App'x H to RC Report; Ex. G-9, App'x I to RC Report.)"

27  **RESPONSE:      UNDISPUTED.**

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    27.    Bombardier engineer John Galanko said in February 2013, stud metal fatigue was

2    not a primary focus but more of a "secondary failure." (Ex. V, Galanko dep. tr. 140:22-141:18.)

3    **RESPONSE:  DISPUTED.  First, the syntax of HDR's statement suggests that Mr.**

4    **Galanko's comment was made in February 2013, however, the statement was made**

5    **on November 3, 2022.  (*See* Doc. 156-5, Ex. V.)  Second, Mr. Galanko testified that his**

6    **opinion was merely "speculation" because he did not recall the report he was being**

7    **questioned about.  (*Id.* at 141:4-18.)  Third, Mr. Galanko's testimony was that the**

8    **stud metal fatigue was not *Bombardier's* primary focus because Bombardier was**

9    **merely "passing [the report] through to HDR to, you know, inform *their* review**

10   **efforts."  (*Id.* at 139:3-140:18.)**

11

12   28.    Bombardier had an engineer, Pete Pritchard, who specialized in metallurgy and

13   materials. (*Id.* 50:4-12)  Neither Pritchard nor any other Bombardier engineer with a metallurgical

14   background were asked to assess the Sky Train failures. (*Id.* 52:1-4; 15-24.)

15   Allegation 1:        "Bombardier had an engineer, Pete Pritchard, who specialized in

16   metallurgy and materials. (*Id.* 50:4-12)"

17   **RESPONSE:        DISPUTED.  Mr. Galanko did not testify that Pete Pritchard**

18   **specialized in metallurgy and materials, he testified that "Pete Pritchard would have**

19   **been the one that kind of had that hat as far as metallurgy expertise."  (Doc. 156-5,**

20   **Ex. V at 51:18-19.)**

21

22   Allegation 2:        "Neither Pritchard nor any other Bombardier engineer with a

23   metallurgical background were asked to assess the Sky Train failures. (*Id.* 52:1-4; 15-24.)"

24   **RESPONSE:        DISPUTED.  In the testimony HDR cites in support of this alleged**

25   **fact, Mr. Galanko testified "not that I can recall."  (Doc. 156-5, Ex. V at 52:1-4; 52:15-**

26   **24.)**

27

28   29.    John Galanko further testified:

- 19 -

Q.  Did HDR do great work for you on this project?
A.  At the time I thought they were doing great work, yeah, I mean, great -- I don't
    Know about great.  Good. At least very good. Very good, yeah.

                              ***

Q.  Did you get the deliverables on this project and say, hey, HDR, you forgot to
    Do these certain calculations?
A.  Not off the top of my head.

                              ***

Q.  Did Wiss Janney ever say to anyone . . . that HDR . . . needed to do other
    Calculations that weren't included in the package?
A.  [N]ot that I can recall.

(*Id.* at 152:6-10; 153:10-13, 155:3-6.)

**RESPONSE:    DISPUTED as to the testimony regarding Wiss Janney.   Mr.
Galanko testified that he was sure that Wiss Janney raised concerns about HDR's
work, but that he could not recall specifics without "check[ing] the record on that."
(Doc. 156-5, Ex. V at 154:13-155:2.)**


30.    Galanko also testified:

Q.  [A]fter this March 28, 2013 report, did anyone at Bombardier request further
    Analysis, calculations or other failure analysis type work from HDR?
A.  Not that I can recall.
Q.  Did anyone at Bombardier point out any deficiencies in HDR's work after
    Receiving this report?
A.  Not that I can recall.

(*Id.* at 181:12-18.)

**RESPONSE:    UNDISPUTED.**


31.    Galanko further testified:

Q.  Now, at any time, did Wiss, Janney say that someone should look at fatigue or
    The anchor studs on the ride plates?
A.  Not that I recall off the top of my head.
Q.  Okay.  And there's -- at any time, did Bombardier specifically request that HDR
    Look at fatigue of the anchor studs?
A.  Not that I recall off the top of my head.

                              ***

Q.  Did Wiss, Janney or the city suggest further calculations be done after
    Reviewing the plans and calculations for the retrofit put together by HDR?

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

A. Not that I can . . . recall.

Q. Now, upon the city or Wiss, Janney's review of the HDR retrofit plans and Calculations, did anyone raise any issues about analysis not being complete or Additional analysis needing to be done?

A. [N]ot that I can recall.

(*Id.* at 184:3-10; 198:3-11.)

**RESPONSE:      DISPUTED.    The testimony HDR fails to cite includes Mr. Galanko's opinion that Bombardier did not request HDR look at the fatigue of the anchor studs because Bombardier was "depending on HDR to give [Bombardier] guidance on what other stones need to be turned over, so to speak."  (Doc. 156-5, Ex. V at 184:7-13.)**

32.      HDR Representative James Van Dien testified HDR "had no reason to look at the studs.  There were no--there was no failure.  There was no fatigue in the studs.  We were hired to look at the failure of the . . . concrete plinth.  So there . . . was no reason for us to look at the studs." (Ex. W, J. VanDien dep. tr. 32:21-33:2.)

**RESPONSE:      DISPUTED.  HDR's scope of work was set forth in the parties' agreement.  Furthermore, James Van Dien acknowledged that HDR did analyze the "bending stress in the stud based on moment arm of 1 inch."  (Doc. 156-6, Ex. W at 136:6-137:3.)**

33.      HDR's retrofit design for the concrete plinths was adopted and remains in use to this day. (*Id.* at 91:4-5 ("[T]hat retrofit has performed well since that time [2013]."))

**RESPONSE: UNDISPUTED.**

34.      The concrete plinth repairs were by March 2013, and the Sky Train opened for passenger service on April 8, 2013. (Ex. K, 100:24-101:2; Ex. HH, Sky Train Press Release.) Bombardier obtained a Certificate of Final Completion on July 31, 2013. (Ex. C at ¶ 37.)

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Allegation 1:  "The concrete plinth repairs were by March 2013, and the Sky Train opened for passenger service on April 8, 2013. (Ex. K, 100:24-101:2; Ex. HH, Sky Train Press Release.)"

**RESPONSE:  As written, Bombardier can neither confirm nor deny this alleged fact because an operative word appears to have been omitted.  Bombardier does not dispute that the "Phoenix City Council and Mayor Greg Stanton" took the first ride on the Sky Train on April 8, 2013.  (Doc. 158-7, Ex. HH.)**

Allegation 2:  Bombardier obtained a Certificate of Final Completion on July 31, 2013. (Ex. C at ¶ 37.)

**RESPONSE:        UNDISPUTED.**

35.      Bombardier brought breach of contract claims against CK and SGI in an earlier action, which settled. (*See* Doc. 76 at 2; Doc. 120 at Ex. A (Settlement Agreement.))

**RESPONSE:        DISPUTED.    Bombardier brought breach of contract claims against CK.  Bombardier brought a negligence claim and a breach of implied warranty claim against SGI.  (*See* Case No. 2:14-cv-00876-PGR.)**

36.      LPI, Inc. reviewed the 2013 failures and authored an expert report for Bombardier in connection with the 2014 litigation. (Ex. DD, Feb. 27, 2015 Rep. of R. Vecchio at 1.)  LPI was "asked to review the various designs and the retrofits and provide [their] opinion" on "the failure of the ride plate, principally with regard to the concrete breakout." (Ex. X, Vecchio dep. tr. at 14:2-9.)  Vecchio's review of HDR's work led him to write that "[t]he HDR design calculation […] represents a viable design calculation by a competent design professional[.]" (Ex. DD at 14)  Vecchio also testified:

Question: Did you raise any issues with Bombardier about fatigue of the studs on the metal ride plates?
Vecchio: . . . ***I know we talked about it briefly*** but I don't recall specifically.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

(Ex. X at 19:17-22 (emphasis added)).

Allegation 1: "LPI, Inc. reviewed the 2013 failures and authored an expert report for Bombardier in connection with the 2014 litigation. (Ex. DD, Feb. 27, 2015 Rep. of R. Vecchio at 1.)"

**RESPONSE:     DISPUTED.   LPI, Inc. reviewed the calculations, designs, and drawings of other engineers.  (*See* CSOF at ¶ 74.)  Bombardier does not dispute that LPI, Inc., authored an expert report for litigation.  (*Id.* at ¶ 8; *see also* Doc. 156-7, Ex. X at 15:24-16:4.)**

Allegation 2:  "LPI was "asked to review the various designs and the retrofits and provide [their] opinion" on "the failure of the ride plate, principally with regard to the concrete breakout." (Ex. X, Vecchio dep. tr. at 14:2-9."

**RESPONSE:     UNDISPUTED.**

Allegation 3:  "Vecchio's review of HDR's work led him to write that '[t]he HDR design calculation […] represents a viable design calculation by a competent design professional[.]' (Ex. DD at 14)"

**RESPONSE:     DISPUTED.  To the extent HDR is attempting to imply that Mr. Vecchio approved of HDR's work, Mr. Vecchio's review of HDR's calculations and designs were limited to HDR's redesign of the concrete plinth, not HDR's review of the original design.  (*See* CSOF at ¶ 73.)**

Allegation 4:  "Vecchio also testified:

> Question: Did you raise any issues with Bombardier about fatigue of the studs on the metal ride plates?
> Vecchio: . . . *I know we talked about it briefly* but I don't recall specifically.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

(Ex. X at 19:17-22 (emphasis added)).”

**RESPONSE:**   **UNDISPUTED.**

37.    SGI's expert in the 2014 litigation, Michael McCall, reviewed the consensus Root Cause Report, including "Appendices A, B, F, G, H, and I," to prepare his report. (Ex. EE, March 30, 2015 Rep. of M. McCall at 6.)  Vecchio reviewed the McCall report when authoring his rebuttal report. (Ex. FF, May 1, 2015 Rebuttal Rep. of R. Vecchio at 18).

Allegation 1:   "SGI's expert in the 2014 litigation, Michael McCall, reviewed the consensus Root Cause Report, including "Appendices A, B, F, G, H, and I," to prepare his report. (Ex. EE, March 30, 2015 Rep. of M. McCall at 6.)"

**RESPONSE:**   **DISPUTED.  The cited portion of Mr. McCall's report specifically says "The copy of the report I reviewed *did not include the appendices*; however, in separate documents, I reviewed *what I assumed are the relevant contents of Appendices A, B, F, G, H, and I*."  (Doc. 157-6, Ex. EE at 14, § 2.1.9.)**

Allegation 2:   "Vecchio reviewed the McCall report when authoring his rebuttal report. (Ex. FF, May 1, 2015 Rebuttal Rep. of R. Vecchio at 18)"

**RESPONSE:**    **UNDISPUTED that Mr. Vecchio reviewed Mr. McCall's Report. DISPUTED to the extent HDR is attempting to imply that Mr. Vecchio reviewed the appendices to the Root Cause Report in 2015 because he reviewed Mr. McCall's report.  The appendices are not included in, or attached to Mr. McCall's report, and Mr. Vecchio did not see the appendices until 2022.  (*See* CSOF at ¶ 82; *see also* Doc. 157-6, Ex. EE.)**

38.    On September 4, 2020, a Type 3 expansion joint ride plate failed.  The anchor studs connecting the ride plates to the concrete failed at the stud-to-plate weld. (Ex. E at 5.)

**RESPONSE:**   **UNDISPUTED.**

1

2       39.    The City of Phoenix asked WJE to investigate this failure.  WJE issued a report

3   stating the welds and vertical anchoring studs attaching the ride plates to the concrete plinths

4   exhibited fatigue cracking. (Ex. Y, Nov. 5, 2020 Rep. of WJE at 5; Ex. C at ¶ 43-44.)  WJE

5   recommended Bombardier evaluate "the fatigue life of the as-designed ride plate stud weld

6   connections." (Ex. Y at 5.)

7       **RESPONSE:**    **UNDISPUTED.**

8

9       40.    Bombardier retained Weitz to demolish and reconstruct the September 4, 2020

10  failed ride plate.  (Ex. C at ¶ 45.)

11      **RESPONSE:**    **UNDISPUTED.**

12

13      41.    On January 24, 2021, four additional Type 3 ride plates failed.  (*Id.* ¶ 47.)

14      **RESPONSE:**    **UNDISPUTED.**

15

16      42.    Bombardier retained LPI to determine the cause of the September 4, 2020 and

17  January 24, 2021 failures. (*Id.* ¶ 48.)  LPI, through engineer Robert Vecchio, concluded the failures

18  were caused by "high cyclic [fatigue] stress at the stud-to-plate weldment produced by excessive

19  local bending induced by vertical tire loading." (Ex. F at 43.)  The "[s]tud failures occurred by

20  fatigue cracking that initiated from the cantilever side of the studs at stud weld flashing stress

21  concentration." (*Id.* at 42.)

22      **RESPONSE:**    **UNDISPUTED.**

23

24      43.    Four of Vecchio's five recommendations in his 2021 Report address issues at the

25  stud-to-plate weld: (i) an acceptable design modification must, among other things, "[r]evise the

26  weld detail at the embedment-to-plate interface so as to reduce the highly localized bending

27  stresses," (ii) "[m]itigate crack-like discontinuities at the embedment-to-plate weld detail," (iii)

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

"[b]lend grind all weld profiles to reduce local stress concentration effects," and (iv) "[a]fter blend grinding, needle peen all welds and adjacent base metal[.]" (*Id.* at 44.)

**RESPONSE:      UNDISPUTED.**

44.      Bombardier re-engaged LPI, n/k/a SOCOTEC Engineering, Inc., (*see* Ex. Z, Jan. 18, 2022 Inv.), to offer expert opinions in this litigation.  Robert Vecchio, the same engineer who authored the 2015 litigation report and the 2021 investigation report, authored the expert report. (Ex. AA, March 9, 2022 Rep. of R. Vecchio.)  Vecchio incorrectly opined that HDR's retrofit design did not meet the standard of care because HDR did not consider the "fatigue design of the vertical stud-to-plate weldments." (*Id.* at 33.)  Vecchio's 2022 Report states:

> HDR was negligent in aspects of their failure analysis performed back in 2013.  The photograph showing the single vertical stud still imbedded in concrete immediately after the ride plate failure . . ., and the subsequent metallurgical analysis [performed by METL] . . . show that the stud failure was not caused by a ductile overloading condition.  Indeed, the flatness of the failure surface and clear fatigue initiation sites indicate *that fatigue was the failure mechanism.  Additionally, the opinions provided in METL report were also incorrect.*  For example, the METL reports states that "[the failure is] indicative of a rapid failure."  This is unequivocally wrong.

(*Id.*)

Allegation 1:  "Bombardier re-engaged LPI, n/k/a SOCOTEC Engineering, Inc., (*see* Ex. Z, Jan. 18, 2022 Inv.), to offer expert opinions in this litigation."

**RESPONSE:      UNDISPUTED.**

Allegation 2:  "Robert Vecchio, the same engineer who authored the 2015 litigation report and the 2021 investigation report, authored the expert report. (Ex. AA, March 9, 2022 Rep. of R. Vecchio.)"

**RESPONSE:      UNDISPUTED.**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

2

3

Allegation 3:  Vecchio incorrectly opined that HDR's retrofit design did not meet the standard of care because HDR did not consider the 'fatigue design of the vertical stud-to-plate weldments.' (*Id.* at 33.)"

4

5

6

7

**RESPONSE:   DISPUTED.   This statement inappropriately presents HDR's opinion as fact.  To the contrary, HDR's engineer, James Van Dien, testified during his deposition that HDR did not perform any analysis of the ride plate anchor studs. (*See* Doc. 156-6, Ex. W at 32:21-33:2.)**

8

9

Allegation 4:  Vecchio's 2022 Report states:

10

11

12

13

14

15

16

> HDR was negligent in aspects of their failure analysis performed back in 2013.  The photograph showing the single vertical stud still imbedded in concrete immediately after the ride plate failure . . ., and the subsequent metallurgical analysis [performed by METL] . . . show that the stud failure was not caused by a ductile overloading condition.  Indeed, the flatness of the failure surface and clear fatigue initiation sites indicate *that fatigue was the failure mechanism.  Additionally, the opinions provided in METL report were also incorrect.*  For example, the METL reports states that "[the failure is] indicative of a rapid failure."  This is unequivocally wrong.

17

(*Id.*)

18

**RESPONSE:     UNDISPUTED.**

19

20

21

45.     Vecchio incorrectly identifies METL as a "subcontractor" of HDR. (*Id.* (emphasis added); *see* Ex. L at 4 (noting the METL report was requested by Weitz).)

22

**RESPONSE: UNDISPUTED.**

23

24

25

26

27

46.     Vecchio testified the photographs in the METL report clearly indicate metal fatigue, and when he "looked at the photographs, it was ***clear that that stud had failed by fatigue.***" (Ex. X at 77:2-4 (emphasis added.))  He also testified that, based on his review of the METL report, "whoever evaluated this initially [in 2013] did not consider the actual weld detail type properly or

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   where the cracking is illustrated to initiate from and where the tests that were performed that built

2   these AASHTO curves developed fatigue cracking in." (*Id.* at 129:12-18.)

3       **RESPONSE:**       **UNDISPUTED.**

4

5       47.     Ann Kurtenbach testified on behalf of the City of Phoenix that 32 of the Type 3

6   plates were replaced, "upon recommendation from Bombardier." (Ex. K at 84:2-10.)

7       **RESPONSE:**       **DISPUTED.  The recommendation to replace the Type 3 ride plates**

8       **came from Bombardier's expert engineering consultants, LPI, Inc. (*See* Doc. 153-8,**

9       **Ex. F.)**

10

11      48.     HDR was invited to a pre-litigation inspection of destructive testing of 2 samples

12  of the 2020 and 2021 failed ride plates. (Ex. CC ¶ 16.)  HDR was not provided an opportunity to

13  inspect the other failed plates *in situ* or to determine if any ride plates that had not failed

14  demonstrated fatigue cracking. (*Id.*)

15      Allegation 1:  "HDR was invited to a pre-litigation inspection of destructive testing of 2

16      samples of the 2020 and 2021 failed ride plates. (Ex. CC ¶ 16.)"

17      **RESPONSE:**       **UNDISPUTED.**

18

19      Allegation 2:  "HDR was not provided an opportunity to inspect the other failed plates *in*

20      *situ* or to determine if any ride plates that had not failed demonstrated fatigue cracking.

21      (*Id.*)"

22      **RESPONSE:**       **DISPUTED.  Bombardier's notice to HDR requested that HDR**

23      **inform Bombardier "if you wish to attend and observe *or have any objections* to our**

24      **proposed examination and testing."  (Doc. 157-4, Ex. CC-G at 51.)  Furthermore,**

25      **Bombardier noted that "[i]f you do not respond by Monday, February 22, 2021, we**

26      **will assume that you do not have any objections and that you do not wish to attend."**

27      **(*Id.*)  HDR did not respond to the notice.**

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

49.     Only 4 ride plates were analyzed for fatigue cracks. (Ex. K at 89:18-22.)  Only 6 of the 32 ride plates had any "visible indicia of failure." (*Id.* at 87:6-8.)  Engineering firm Gannett Fleming inspected the September 4, 2020 "failed" ride plate but determined that "[t]he ride plates at the other ride plate locations at Pier 18 were. . . in good condition." (Ex. Y at 2.)

Allegation 1:  "Only 4 ride plates were analyzed for fatigue cracks. (Ex. K at 89:18-22.)"

**RESPONSE:       DISPUTED.  The cited testimony states that six ride plates were analyzed.  (Doc. 155-4, Ex. K at 89:18-22) (Noting that the City of Phoenix understood "two ride plates that failed in 2020" were analyzed, and "four ride plates that exhibited signs of failure in 2021" were analyzed.)  Additionally, the ride plates were not analyzed for fatigue cracks, they were analyzed to determine the cause of the failures.  (*See* Doc. 156-8 Ex. Y; Doc. 153-8, Ex. F.)**

Allegation 2:  "Only 6 of the 32 ride plates had any 'visible indicia of failure.'" (*Id.* at 87:6-8.)"

**RESPONSE:       DISPUTED.  The defect was present in the ride plate design for all 32 Type 3 ride plates.  (*See* Doc. 156-8 Ex. Y; Doc. 153-8, Ex. F.)**

Allegation 3:  "Engineering firm Gannett Fleming inspected the September 4, 2020 'failed' ride plate but determined that "[t]he ride plates at the other ride plate locations at Pier 18 were. . . in good condition." (Ex. Y at 2.)"

**RESPONSE:       DISPUTED.  The Gannett Fleming report does not suggest that the September 4, 2020 failed ride plate did not fail, as HDR's proposed statement of fact implies with the use of quotations around the word "failed."  Furthermore, the document cited in support of this purported fact is WJE's summary of Gannet Fleming's findings, it is not Gannett Fleming's report.  (*See* Doc. 156-8, Ex. Y.)  Lastly, HDR misquotes WJE's summary.  WJE's report states, "[t]he ride plates at *the three other* ride plate locations at Pier 18 were determined by Gannett Fleming to be in good condition."  (Doc. 156-8, Ex. Y at 3.)**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

50.     Bombardier has disclosed the following general categories of damages:

| Description of Damages | Amount |
|---|---|
| LPI (SOCOTEC) Investigation/Design | $3,815,000 |
| Weitz Demolition/Installation | $13,455,882 |
| Mitigation (bussing credits) | $227,432 |
| **Total Amount of Damages Incurred To Date** | **$17,498,314** |

(Ex. BB, Pltf's Third Disclosure Statement at 8.)  The provided invoices do not support the full measure of damages claimed by Bombardier. (Ex. GG, Disclosed Invoices from Bombardier.)

Allegation 1:  Bombardier has disclosed the following general categories of damages:

| Description of Damages | Amount |
|---|---|
| LPI (SOCOTEC) Investigation/Design | $3,815,000 |
| Weitz Demolition/Installation | $13,455,882 |
| Mitigation (bussing credits) | $227,432 |
| **Total Amount of Damages Incurred To Date** | **$17,498,314** |

(Ex. BB, Pltf's Third Disclosure Statement at 8.)

**RESPONSE:     DISPUTED.  The above general categories of damages correspond to Bombardier's Third Disclosure Statement.   The amounts reflected in Bombardier's Fifth Amended Initial Disclosure are as follows:**

| Description of Damages | Amount |
|---|---|
| LPI (SOCOTEC) Investigation/Design | $3,822,813 |
| Weitz Demolition/Installation | $13,642,187 |
| Mitigation (bussing credits) | $227,432 |
| **Total Amount of Damages Incurred To Date** | **$17,692,432** |

**(*See* Doc. 172; *see also* Bombardier's Fifth Supplemental Rule 26(a)(1) Disclosure, Ex. 19.)**

Allegation 2:  "The provided invoices do not support the full measure of damages claimed by Bombardier. (Ex. GG, Disclosed Invoices from Bombardier.)"

**RESPONSE:     DISPUTED.  The invoices support the full measure of damages that have been invoiced to Bombardier. (*See* CSOF at ¶¶ 83 and 85;*see also* Doc. 158-1,**

**Ex. GG.)  Bombardier is also seeking damages for costs that it will incur in the future as a result of HDR's breach of contract, costs for which Bombardier has received estimates, but has not yet received invoices.  (*See* CSOF at ¶¶ 84 and 86.)**

51.    HDR never contracted with Bombardier to review the designs of any other assembly of which the Type 2 and Type 3 running plinth expansion joints were a component. (Ex. CC ¶ 6.)  Bombardier had already retained experts to look into other metallurgical issues within the studs by retaining METL and ATA. (*Id.* ¶ 9.)  HDR never received construction specifications about the stud-to-ride plate weldments for Type 2 or 3 ride plates. (*Id.* ¶ 10.)

Allegation 1:  "HDR never contracted with Bombardier to review the designs of any other assembly of which the Type 2 and Type 3 running plinth expansion joints were a component. (Ex. CC ¶ 6.)"

**RESPONSE:    UNDISPUTED that HDR's review was limited to the Type 2 and Type 3 running plinth expansion joints.**

Allegation 2:  "Bombardier had already retained experts to look into other metallurgical issues within the studs by retaining METL and ATA. (*Id.* ¶ 9.)"

**RESPONSE:    DISPUTED.  METL was retained by The Weitz Company, not Bombardier.  (*See* Doc. 155-5, Ex. L.)  Additionally, ATA Engineering, Inc. ("ATA"), was not hired to "look into other metallurgical issues within the studs."  ATA was hired to perform strain gage testing of the expansion joints, in order to "quantify the stress levels observed in the expansion joint plates as well as the global deformation and structural dynamic response due to the application and removal of load as the train passes over."  (Doc. 154-10, Ex. G-9 App'x I at 7.)**

Allegation 3:  "HDR never received construction specifications about the stud-to-ride plate weldments for Type 2 or 3 ride plates. (*Id.* ¶ 10.)"

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    **RESPONSE:      DISPUTED.      Bombardier objects to the use of the term**
2    **"construction specifications" as vague and ambiguous.   Notwithstanding this**
3    **objection, Bombardier provided HDR with the Running Surface Detail Sheets for the**
4    **Type 2 and Type 3 expansion joints.  The detail sheets include the ride plates, the**
5    **anchor studs, and specify the weldments.  (*See* CSOF at ¶ 61.)**
6
7    52.    Had HDR been tasked with a comprehensive review of *all* CK/SGI designs, it
8    would have taken longer than 10 days and cost considerably more than $13,700. (*Id.* ¶ 14.)
9    **RESPONSE:      DISPUTED.   HDR was tasked with a comprehensive review of**
10    **CK/SGI's expansion joint design, not all of CK/SGI's designs.  (*See* CSOF at ¶¶ 60-**
11    **62.)**
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

II.    **BOMBARDIER'S SEPARATE STATEMENT OF FACTS IN OPPOSITION TO**

**HDR'S MOTION**

In addition to the foregoing, pursuant to Local Rule 56.1(b)(2) and the Court's Case Management Order (Doc. 30), Bombardier submits the following additional controverting facts establishing genuine issues of material fact or otherwise precluding judgment in favor of HDR.

53.    In 2009, Bombardier and the City of Phoenix entered into contracts for Bombardier to design, build, operate, and maintain the Phoenix Sky Harbor International Airport PHX Sky Train System at the Phoenix Sky Harbor International Airport.  (Decl. of Robert DeCostro, Ex. 3 at ¶ 6.)

54.    The Guideway has five types of expansion joints that Bombardier refers to as Type 1, Type 2, Type 3, Type 4, and Type 5.  (Dep. of Randall Poston, Ex. 4 at 99:23-100:19.)

55.    The Sky Train expansion joints include the steel ride plates, the anchor studs, and the concrete that supports the ride plates.  (*See* Doc. 156-6, Ex. W, Dep. of J. Van Dien, at 38:4-14; *see also* Ex. 5, Dep. of Justin Stewart, at 39:17-24; Ex. 6, Dep. of Peter Lofquist, at 36:10-17.)

56.    The CK Group, Inc. ("CK"), the original designer of the expansion joints, subcontracted the design of the expansion joints to Structural Grace, Inc. ("SGI") because CK did not employ any structural engineers.  (Ex. 7, Dep. of James Schumann, 20:8-22:5.)

57.    SGI's primary designer of the expansion joints was not a licensed structural engineer, she was an Arizona State University student with an "engineer-in-training certificate." (January 14, 2015 Dep. of Andrew Haines, Ex. 18 at 144:2-8; 174:19-175:10.)

58.    On January 24, 2013, a Type 2 ride plate experienced a complete structural failure of the concrete below the embedded plate.  (Decl. of Robert DeCostro, Ex. 3 at ¶6.)

59.    The same day, Bombardier inspected all of the remaining ride plates and found three additional with concrete cracking.  (*See id.*)

60.    In its January 28, 2013 email to HDR, in which Bombardier discussed the scope of work for which it was retaining HDR, Bombardier requested that HDR perform an independent review of the design reflected in the Sky Train guideway design plan sets.  (Doc. 155-1, Ex. H.)

61.     Included in the design plan set referenced by Bombardier, were the Running Surface Detail Sheets RS04-001 thru RS-04-007, which include the details for the expansion joints, including the ride plates and anchor studs.  (Ex. 8, Running Surface Detail Sheets RS04-001 thru RS-04-007.)

62.     HDR's scope of work included in the February 26, 2013 Purchase Order included an "independent review of the original design provided by The CK Group/Structural Grace" of the "Type 2 and Type 3 running plinth expansion joints installed for the PHX Sky Train system." (Doc.156-4, Ex. U, p. 2-3.)

63.     Because the lives of the passengers of the Sky Train depend on the integrity of the expansion joints, Bombardier hired HDR to review the SGI's defective design of entire expansion joint system.  (Decl. of Robert DeCostro, Ex. 3 at ¶11.)

64.     Bombardier never limited HDR's review to any component of the expansion joint system.  (*Id.*)

65.     HDR was the entity that diagnosed the cause of the failures as a concrete breakout failure.  (Ex. 5, Dep. of Justin Stewart, at 173:6-9.)

66.     On February 1, 2013, HDR provided Bombardier with a letter reporting the results of its "independent review of the running surface ride plates" for the PHX Sky Train.  (Ex. 9.)

67.     HDR then developed a redesign of the expansion joint's concrete plinths in order to remedy the failure that it had identified.  (Dep. of Justin Stewart, Ex. 5 at 173:2-12; *see also* Ex. 10, Dep. of Mark Pavlick, at 28:9-19 ("And in determining that load path, it's important, before you can solve a problem, you need to know what the problem is").)

68.     HDR concluded that SGI's original design of the expansion joints failed to account for all of the forces exerted on the ride plates, which resulted in the concrete plinths failing.  (*See* Doc. 154-1, Ex. G at 13.)

69.     At the time that HDR diagnosed the cause of the Original Failures, it had not performed a comprehensive review of the fatigue design of the ride plate anchor studs.  (*See* Doc. 156-6, Ex. W, Dep. of J. Van Dien, at 62:21-63:12 ("We didn't look at fatigue in the ride plates because there was no reason for us to do so."); *see also* Ex. 10, Dep. of Mark Pavlick, at 31:19:32-

4 ("[T]here was no need to be concerned with the original system of the ride plates because that did not fail.").)

70.     HDR never suggested to Bombardier that a problem might exist in the design of the steel anchor studs, or welds.  (Decl. of Robert DeCostro, Ex. 3 at ¶18.)

71.     Bombardier relied upon HDR and its conclusions, and Bombardier trusted that HDR's proposed changes would eliminate future failures caused by SGI's design.  (Decl. of Robert DeCostro, Ex. 3 at ¶18.)

72.     At the time HDR diagnosed the cause of the Original Failures, it had performed calculations related to the bending forces on the ride plate anchor studs.  (Doc. 156-6, Ex. W, Dep. of J. Van Dien, at 136:6-137:3; *see also* Ex. 11 at 16, HDR Calculations.)

73.     Although HDR did not inspect every concrete plinth for each Type 2 and Type 3 expansion joint on the Sky Train, HDR's 2013 "retrofit design was applied to all of the joints." (See Doc. 156-6, Ex. W, Dep. of J. Van Dien, at 180:17-181-1.)

74.     As part of its claims against CK and SGI, Bombardier hired Robert Vecchio of LPI, Inc., to review the retrofit design and calculations of CK/SGI, and the retrofit design and calculations of HDR.  (Aff. of Robert Vecchio, Ex. 12 at ¶ 7.)

75.     In 2015, Robert Vecchio drafted an expert report and a rebuttal report to SGI's expert.  (Aff. of Robert Vecchio, Ex. 12 at ¶ 8.)

76.     On September 4, 2020, all of the steel anchor studs for one of the Type 3 expansion joint ride plates failed, and the ride plate broke apart from the concrete plinth causing damage to the Guideway.  (Decl. of Robert DeCostro, Ex. 3 at ¶18.)

77.     On January 24, 2021, Bombardier discovered four additional expansion joint ride plate failures.  (Decl. of Robert DeCostro, Ex. 3 at ¶19.)

78.     In order to determine the root cause of the 2020 and 2021 ride plate anchor stud failures, Bombardier hired LPI, Inc., to conduct a root cause analysis.  (*See* Doc. 153-8, Ex. F; *see also* Dep. of Milton Bradshaw, Ex. 13 at 23:5-8.)

- 35 -

79.     Bombardier's expert engineering consultant concluded that the design for the ride plate anchor studs does not adequately resist the applied loading, and the fatigue life of the studs is approximately 8 years.  (*See id.* at 43.)

80.     In his expert report, Robert Vecchio concludes that although HDR reviewed the original design of the expansion joints, it "erred in either failing to review the SGI fatigue design or reviewing it and not finding fault with it."  (Doc. 156-10, Ex. AA at 36.)

81.     Mr. Vecchio also concluded that if Bombardier had been informed that the fatigue design was flawed, "the fatigue design could have come under detailed analysis" at that time.  (*Id.*)

82.     Mr. Vecchio did not receive a copy of the METL report until 2022, when he drafted his expert report for this matter.  (Aff. of Robert Vecchio, Ex. 12 at ¶11.)

83.     To date, Bombardier has incurred $3,152,813 in costs to investigate and redesign the Type 3 ride plates.  (*See* Dep. of Milton Bradshaw, Ex. 13 at 67:10-70:22; 73:3-11; *see also* Doc. 158-1 - 158-6, SOCOTEC Invoices #1 - #24, Ex. GG at 5 through GG-5 at 3; *see also* SOCOTEC Invoices #25 - #29, Ex. 14.)

84.     Bombardier has received estimates from SOCOTEC for the costs associated with the investigation and redesign the Type 2, 4, and 5 ride plates, which totals an additional $670,000.  (*See* Dep. of Milton Bradshaw, Ex. 13 at 67:10-70:22; *see also* Ex. 15, SOCOTEC Proposal for Type 2, 4, and 5 ride plates.)

85.     Bombardier has already incurred $3,132,727 in costs to remove the defectively designed Type 3 ride plates and install the redesigned Type 3 ride plates.  (*See* Dep. of Milton Bradshaw, Ex. 13 at 87:2-25; *see also* Doc. 158-6, Ex. GG-5 at 4-18; *see also* Ex. 16, Weitz Pay Applications #5 and #6.)

86.     Owing to the fact that there are more than 200 more Type 2, 4, and 5 ride plates than there are Type 3 ride plates, Bombardier has determined that the cost to install the redesigned Type 2, 4, and 5 ride plates will conservatively cost $10,509,460.  (*See* Dep. of Milton Bradshaw, Ex. 13 at 99:19-106:21; *see also* Ex. 17, December 13, 2022 Amended Memorandum for Type 2, 4, and 5 ride plate remediation.)

87.     On February 25, 2021, the City of Phoenix deducted $227,432 from its January 2021 and February 2021 monthly invoices, to reimburse the City of Phoenix "for the cost to bus passengers between January 25 and February 19." (*See* Dep. of Milton Bradshaw, Ex. 13 at 114:18-115:13; *see also* Doc. 158-1, Ex. GG at 3-4.)

88.     Doug Heitzenrater was forced to step away from his work at Bombardier from January 2013 through the middle of March 2013, to attend to a personal situation with his family, during which time his Bombardier colleagues assumed his responsibilities. (Aff. of Doug Heitzenrater, Ex. 1 at ¶ 5.)

89.     On March 22, 2013, Mark Pavlick, of HDR, sent various Bombardier employees, including Mr. Heitzenrater, a draft copy of HDR's Root Cause Report. (*Id.* at ¶ 7.)

90.     In its report, HDR discussed the procedure for testing the Sky Train system by placing weighted bags on empty trains to simulate different loading conditions. (*Id.* at ¶ 8.)

91.     Mr. Heitzenrater noticed that HDR did not specify the weight of the bags palced on the trains, or the number of tire cycles that were crossing the expansion joints when it was explaining its calculations. (*Id.* at ¶ 9.)

92.     Mr. Heitzenrater suggested that HDR consider the weight of the bags and the number of cycles in order to properly evaluate the fatigue life of the Sky Train system, including all components of the expansion joints. (*Id.* at ¶ 10.)

93.     On March 28, 2013, Mr. Heitzenrater responded to Mark Pavlick's email providing the draft report and said "Bagged matl should be directly equated to a weight when used in the paragraph regarding cycles.  Are the tire passes single tire passes on an exp plate?" (*Id.* at ¶ 11.)

94.     When Mr. Heitzenrater wrote his email, he did not know, or have reason to know, that there was an existing fatigue design defect in the ride plate design. (*Id.* at ¶ 12.)

95.     Mr. Heizenrater intended his comment to suggest HDR consider the weight of the bags in order to inform its root cause analysis. (*Id.* at ¶ 12.)

DATED this 9th day of February, 2023.

SNELL & WILMER L.L.P.

By: */s/ Jason Ebe*
Jason Ebe
Creighton P. Dixon
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004

K&L GATES, LLP

By: */s/ Talor I. Bearman*
Jason L. Richey (Admitted Pro Hac Vice)
Talor I. Bearman (Admitted Pro Hac Vice)
Justin Leonelli (Admitted Pro Hac Vice)
210 Sixth Avenue
Pittsburgh, PA 15222

*Attorneys for Bombardier Transportation
(Holdings) USA Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all parties.

*/s/ Talor Bearman*

**Bombardier Transportation (Holdings) USA Inc.**
**Vs.**
**HDR Engineering, Inc., et al.**
**Case No. CV-21-01460-PHX-SPL**

<u>**INDEX OF EXHIBITS**</u>
**Plaintiff Bombardier Transportation (Holdings) USA Inc.'s Controverting and Supplemental Statement of Facts in Support of its Opposition to Defendant HDR Engineering, Inc.'s Motion for Summary Judgment**

1.      Affidavit of Doug Heitzenrater

2.      Change Order Letter (April 11, 2013)

3.      Declaration of Robert DeCostro

4.      Deposition of Randall Poston

5.      Deposition of Justin Stewart

6.      Deposition of Peter Lofquist

7.      Deposition of James Schumann

8.      Running Surface Detail Sheets RS04-001 thru 007

9.      Independent Review of the Running Surface Ride Plates

10.     Deposition of Mark Pavlick

11.     HDR Calculations from January 13, 2013

12.     Affidavit of Robert Vecchio

13.     Deposition of Milton Bradshaw

14.     SOCOTEC Invoice Nos. 25-29

15.     SOCOTEC Proposals for tasks 1 to 4

16.     Weitz Pay Applications 5 and 6

17.     December 13, 2022 Amended Memorandum for Type 2, 4, 5 Ride Plate Remediation

18.     Deposition of Andrew Haines

19.    Bombardier's Fifth Supplemental Rule 26(a)(1) Disclosure