**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Bombardier Transportation (Holdings) USA Incorporated,

    Plaintiff,

vs.

HDR Engineering Incorporated, et al.,

    Defendants.

No. CV-21-01460-PHX-SPL

**ORDER**

  Before the Court is Defendant's Motion for Summary Judgment (Doc. 152).[1] For the following reasons, the Motion will be granted in part and denied in part.

**I. BACKGROUND**

  In 2009, Plaintiff Bombardier Transportation (Holdings) USA Inc. ("Plaintiff") contracted with the City of Phoenix (the "City") "to design, build, operate, and maintain" the Phoenix Sky Harbor International Airport PHX Sky Train System (the "PHX Sky Train System"). (Doc. 181 at 33). The PHX Sky Train System is a rail system with driverless trains that travel "on a center-rail guideway supported by reinforced concrete plinths." (Doc. 181 at 3). The PHX Sky Train System uses five types of expansion joints at the concrete plinth locations to accommodate thermal movements. (Doc. 181 at 4). As relevant here, the Type 2 and 3 expansion joints have a cantilever steel ride plate that is

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

anchored to the concrete plinth by shear studs that are welded to the ride plate and embedded in the concrete. (Doc. 181 at 4–5). Plaintiff contracted with The CK Group, Inc. ("CK") to design the running surfaces and expansion joints for the PHX Sky Train System. (Doc. 181 at 3–4). CK contracted with Structural Grace, Inc. ("SGI") to perform certain calculations that were incorporated into CK's designs, including for the expansion joints. (Doc. 181 at 3–4, 33).

On January 24, 2013, Plaintiff discovered cracking of the concrete in a Type 2 expansion joint. (Doc. 181 at 33). Upon inspection, Plaintiff discovered that three additional concrete plinths at Type 2 and 3 expansion joints had failed, with the ride plates dislodging from the cracked concrete plinths (the "2013 Failures"). (Doc. 181 at 6, 33). On January 28, 2013, Plaintiff contacted Defendant HDR Engineering Inc. ("Defendant") via email for assistance under the parties' Master Services Agreement ("MSA"), asking Defendant to perform an independent review related to the 2013 Failures. (Doc. 181 at 6–7). Plaintiff also retained other entities to inspect the 2013 Failures, including the Weitz Group, which in turn retained Metals Engineering and Testing Laboratories ("METL") to perform metallurgical testing. (Doc. 181 at 8). METL prepared a report with the results of the testing (the "METL Report"). (Doc. 181 at 8–9).

After receiving the January 28, 2013 email from Plaintiff, Defendant began working on its review. (*See* Doc. 181 at 10–11). On February 26, 2013, Plaintiff sent Defendant a Purchase Order ("P.O.") enumerating six tasks—some of which Defendant had already completed, some of which were in progress, and some of which Defendant had not yet begun. (Doc. 181 at 15–16). The P.O. stated, "This effort is for the Type 2 and Type 3 running plinth expansion joints installed for the PHX Sky Train system." (Doc. 181 at 16). Task 1 of the P.O., "CK/SG Design & Retrofit Review," called in part for "an independent review of the original design provided by [CK]/[SGI]." (Doc. 181 at 15–16). Task 2 of the P.O., "Develop[ ] Retrofit Options," called for Defendant "to develop Type 2 and Type 3 running plinth expansion joint retrofit/replacement options." (Doc. 181 at 15–16). Task 3 of the P.O., "Joint Replacement Construction Drawings,"

called for Defendant "to [d]evelop Type 2 and Type 3 running plinth expansion joint retrofit/replacement construction drawings." (Doc. 156-4 at 4). Task 4 of the P.O., "Joint Failure Report," called for Defendant "to prepare a report that defines the root cause of the Type 2 and Type 3 running plinth expansion joint failures."[2] (Doc. 156-4 at 4).

Pursuant to the P.O., Defendant prepared a Root Cause Report dated March 28, 2013 and, relying on its own work and the work of others including METL, concluded that the original CK/SGI expansion joint design was deficient. (Doc. 181 at 17–18). Plaintiff brought a lawsuit against CK and SGI that eventually settled (the "2014 Litigation"). (Doc. 181 at 22). Defendant developed a retrofit design for the concrete plinths that was adopted and is still in use. (Doc. 181 at 21). The PHX Sky Train System carried its first passengers on April 8, 2013. (Doc. 181 at 22–23).

More than seven years later, on September 4, 2020, all of the anchor studs for a Type 3 expansion joint failed at the stud-to-plate weld, with the ride plate breaking away from the concrete plinth. (Doc. 181 at 24, 35). On January 24, 2021, Plaintiff discovered four additional Type 3 ride plate failures ("the Recent Failures"). (Doc. 181 at 25, 35). After the first of the Recent Failures, the City retained an engineering consultant that found fatigue cracking in the welds and studs that attach the ride plates to the concrete plinths. (Doc. 181 at 25). Following the rest of the Recent Failures, Plaintiff retained an engineering consultant that concluded that the failures resulted from "high cyclic [fatigue] stress at the stud-to-plate weldment." (Doc. 181 at 25). After the Recent Failures, thirty-two Type 3 ride plates were replaced. (Doc. 181 at 28). Plaintiff paid the costs of associated with their replacement. (Doc. 248 at 6; Doc. 250 at 5–6).

On August 23, 2021, Plaintiff initiated this action. (Doc. 1). Plaintiff's only remaining claim is a breach of contract claim against Defendant. (Doc. 105). Plaintiff claims that Defendant's work under the P.O. fell short of the standard of care set forth in the MSA by providing defective and/or incomplete work by failing to identify the stud

---

[2] The parties agree that the fifth and sixth tasks enumerated in the P.O. are irrelevant to Plaintiff's claim. (Doc. 181 at 16).

fatigue issue in SGI's design that caused the Recent Failures. (Doc. 105 at 11; Doc. 195 at 7). Defendant's Motion for Summary Judgment has been fully briefed. (Docs. 152, 195, 209, 249).

## II.  LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy its burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id.* at 322–23. When considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorably to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

## III.  DISCUSSION

Defendant moves for summary judgment based on the statutes of limitations and repose and on the merits of Plaintiff's breach of contract claim. Before addressing those issues, the Court addresses several evidentiary issues raised by Defendant.

### a.  EVIDENTIARY ISSUES

First, Defendant argues that several affidavits attached to Plaintiff's Response to the Motion for Summary Judgment are sham affidavits that should be excluded. Second, Defendant argues that the Court should find or infer that the file of Plaintiff's engineering expert Dr. Robert S. Vecchio from the 2014 Litigation included the METL Report.

#### i.  Sham Affidavits

Defendant argues that the Court should disregard the Declarations of Dr. Vecchio, Plaintiff's expert (Doc. 182-4); Douglas Heitzenrater, an engineer formerly employed by Plaintiff (Doc. 181-1); and Robert DeCostro, who is currently employed by Plaintiff (Doc. 181-3), as sham affidavits. "The sham affidavit rule prevents a party who has been

examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony . . . ." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation, quotation marks, and alteration omitted). Before applying the sham affidavit rule, a court "must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Id.* (citation omitted). A party "is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition[,] and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." *Id.* at 1081 (citation and quotation marks omitted). Courts must apply the rule "with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* at 1080 (citation and quotation marks omitted). The Court addresses the three Declarations to which Defendant objects in turn.

*1. Dr. Vecchio*

Dr. Vecchio testified as follows at his deposition:

> Q: Did you receive the [METL] report as part of your work back in 2013?
>
> A: No, we did not.
>
> . . .
>
> Q: So back in 2013 you did not receive the [METL] metallurgical report?
>
> A: I don't recall.
>
> . . .
>
> Q: Did all of the team members receive the metallurgical report from [METL]?
>
> A: Again, I have—how would I know that?
>
> Q: Well, that's what I'm trying to find out is if you would know from your review of the project files that have been provided to you to date.

5

>A: In 2013 I don't know what others were provided with or not.

(Doc. 248 at 5). Thus, Dr. Vecchio's deposition testimony appears inconsistent within itself: he testified that "we," presumably his team at his firm, did not receive the METL Report, but also that he did not remember whether he received the METL Report and that he did not know whether his team received the METL Report. Inconsistencies *within deposition testimony*, however, do not implicate the sham affidavit rule.

Instead, Defendant argues that Dr. Vecchio's statement in his Declaration that "I was not provided a copy of the METL report during my work as an expert in 2013-2015, and the first time that I saw the METL report was in 2022" contradicts his prior deposition testimony. (Doc. 182-4 at 3). Defendant does not cite to any deposition testimony wherein Dr. Vecchio testified that he saw the METL Report prior to 2022, so the latter part of the statement is plainly not contradictory. And in light of Dr. Vecchio's inconsistent statements at his deposition as to whether he did not *receive* the METL Report in 2013 or whether he did not *recall* whether he received it, it was perfectly acceptable for him to clarify in his Declaration that he was not provided a copy of the report in 2013–2015. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("Aggressive invocation of the [sham affidavit] rule also threatens to ensnare parties who may have simply been confused during their deposition testimony . . . ."). The Court will not exclude Dr. Vecchio's Declaration as a sham affidavit.[3]

### 2. Mr. Heitzenrater

Defendant argues that Mr. Heitzenrater's Declaration is a sham affidavit in two respects. First, Mr. Heizenrater was asked at his deposition about an email he sent on March 28, 2013, testifying:

///

---

[3] Defendant also refers to Dr. Vecchio's deposition testimony regarding a conversation with Plaintiff's attorney in 2013 under the heading "Vecchio's Sham Affidavit," but Defendant does not argue that the Declaration contradicts that deposition testimony in any way. (Doc. 209 at 4). In fact, Dr. Vecchio's Declaration does not even mention that conversation.

6

> A: . . . I'm saying, basically, you've got to . . . calculate the weight and the number of bags on the train to know what the total weight of the train was whenever it passed over the plates to know that it was not in excess, and then equate that weight to the number of—take the weight and the number of cycles that you passed at over a plate to—what I was driving at was a fatigue situation. Like, did the—did the weight and the number of cycles combine to make it an excess for the design.
>
> Q: In other words, the material that was being used on the trains during testing, did that exceed the design criteria of the strength of the studs?
>
> A: That's—I was—I was hovering in that area as far as information without specifically getting into a dissertation here.

(Doc. 248 at 2). Mr. Heitzenrater then testified that he "was looking" at "the total loading" and "number of cycles . . . on the plates." (Doc. 248 at 2). Later in the deposition, when asked if he was "concerned about fatigue life of the anchor studs," Mr. Heitzenrater answered, "I was." (Doc. 153 at 6).

In his Declaration, which Defendant argues contradicts his deposition testimony, Mr. Heitzenrater states that when reviewing a draft of Defendant's Root Cause Report, he noticed that the Report did not specify the weight of the bags placed on the trains or the number of vehicle and tire cycles over the expansion joints during testing of the PHX Sky Train System, which he "felt that [Defendant] should consider . . . because it can be used to evaluate the fatigue life of the entire PHX Sky Train System, including all components of the expansion joint ride plate system." (Doc. 181-1 at 4). Mr. Heizenrater's Declaration further states that in sending the email, he "did not know, or have any reason to know, of an existing fatigue life defect in the ride plate design," but rather "made this comment to simply suggest that [Defendant] consider the weight of the individual bags in order to perform a thorough root cause analysis." (Doc. 181-1 at 4).

Defendant argues that the Declaration contradicts Mr. Heitzenrater's "deposition testimony that he was concerned about loading and the fatigue life of the ride plates and studs, and instead seeks to apply that concern to the fatigue life of the *entire* Sky Train System." (Doc. 209 at 6). But Mr. Heitzenrater never testified at his deposition that he

7

was concerned about a fatigue situation *only* with respect to the ride plates and studs, so there is no clear and unambiguous inconsistency. His expression of his concern about some parts is not necessarily to the exclusion of concern about other parts—especially when one considers that Mr. Heitzenrater said that he was concerned about fatigue in the studs only when counsel specifically asked him about them.

Second, Defendant argues that Mr. Heitzenrater's statement in his Declaration that he "sent an email to Mark Pavlick of [Defendant]" is inconsistent with his deposition testimony that the email was "aimed at [Plaintiff]'s people." (Doc. 248 at 2–3). But both things can be true—that the email was aimed at Plaintiff's people and that it was also sent to Mr. Pavlick. In fact, Mr. Heitzenrater's email appears to have been sent to several employees of both Plaintiff and Defendant, including Mr. Pavlick. (Doc. 156-3 at 2). The Court finds no clear and unambiguous inconsistencies between Mr. Heitzenrater's deposition testimony and his Declaration, so his Declaration will not be excluded.

*3. Mr. DeCostro*

Defendant argues that Mr. DeCostro's Declaration is a sham affidavit because he testified at his deposition that three documents—the MSA, the P.O., and a February 21, 2013 proposal letter—exclusively contained Defendant's scope of work, (Doc. 248 at 3), while his Declaration asserts that Plaintiff hired Defendant to "conduct a thorough review of the entire expansion joint system design," and never limited Defendant's "review to any particular subcomponent of the expansion joint system." (Doc. 181-3 at 3). Clearly, these statements are not facially contradictory. Instead, Defendant argues that the three documents Mr. DeCostro testified about at his deposition *do* limit Defendant's scope of work to the concrete plinths—a question of contract interpretation that the parties have briefed extensively on the merits—making Mr. DeCostro's statement in his Declaration that the scope was not so limited inconsistent.

Defendant's argument is an absolute misuse of the sham affidavit rule. The purpose of the rule is to exclude affidavits that undermine the summary judgment phase by "manufactur[ing] . . . bogus disputes" of fact—not to exclude affidavits that are

8

inconsistent only if one assumes the success of the moving party's legal argument for summary judgment. *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009). Mr. DeCostro's statements regarding what Plaintiff "requested" of Defendant and "hired [Defendant] to" do may or may not be material, but they are certainly not clearly and unambiguously contrary to his deposition testimony. Accordingly, Mr. DeCostro's Declaration will not be excluded.

### ii. Dr. Vecchio's File from the 2014 Litigation

Defendant also asks the Court to find or infer that Dr. Vecchio's file from the 2014 Litigation included the METL Report. When Defendant requested Dr. Vecchio's 2014 file in this litigation, Plaintiff's counsel responded that it was "produced as part of the document production [Defendant] received on November 1, 2022." (Doc. 248-1 at 114 (emphasis added)). It is undisputed that the METL Report was included in Plaintiff's November 1, 2022 production. (Doc. 250 at 4). Thus, Defendant argues that either the November 1, 2022 production was Dr. Vecchio's file and he had the METL Report during the 2014 Litigation, or the production was not Dr. Vecchio's file and Defendant is entitled to an inference that his file included the METL Report as a discovery sanction for failure to disclose. This is a false dichotomy, however, as Plaintiff correctly notes that its counsel represented only that Dr. Vecchio's file was *part of* the November 1, 2022 production—not that the production consisted only of Dr. Vecchio's file. Thus, Plaintiff asserts that although the METL Report was produced on November 1, 2022, it was not part of Dr. Vecchio's file from the 2014 Litigation. Defendant has not established that Plaintiff failed to disclose Dr. Vecchio's file, so a discovery sanction is not warranted. To the extent Defendant wanted Plaintiff to specifically identify what documents composed Dr. Vecchio's 2014 Litigation file, that issue should have been resolved during discovery.

///
///
///
///

### b. STATUTES OF LIMITATIONS AND REPOSE

Plaintiff does not dispute Defendant's assertion that Arizona law applies with respect to the limitations period in this case or that a four-year statute of limitations applies to Plaintiff's breach of contract claim. *See DeLoach v. Alfred*, 960 P.2d 628, 632 (Ariz. 1998) ("Under the revised [Restatement] formula, therefore, the general rule applying the forum's statute of limitations will apply absent exceptional circumstances making that result unreasonable."); A.R.S. § 12-544(3) (providing for a four-year statute of limitations in actions "upon an instrument in writing executed without the state"). A cause of action accrues and the statute of limitations begins to run when "the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 967 (Ariz. 1995).

Defendant argues that Plaintiff was or should have been on notice of the facts giving rise to its claim—specifically, the fatigue issue with the stud-to-plate welds that caused the Recent Failures—as early as 2013 and no later than 2015. "A federal court sitting in diversity may decide that a discovery-based statute of limitations bars a suit as a matter of law 'only when uncontroverted evidence irrefutably demonstrates' that the plaintiff discovered or should have discovered the injury outside the limitations period." *Affiliated FM Ins. Co. v. LTK Consulting Servs. Inc.*, 525 F. App'x 585, 586 (9th Cir. 2013) (citation omitted); *see also Nev. Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992) (stating that the issue of when a plaintiff had sufficient knowledge of underlying facts such that its claim accrued "is generally inappropriate for resolution on summary judgment"). Defendant argues that three pieces of evidence show that the statute of limitations has run.

First, Defendant argues that Plaintiff should have been on notice of a fatigue issue with the welds when it received the METL Report in 2013. The Report shared the findings of METL's metallurgical assessment of a stud from a ride plate that was part of the 2013 Failures. (Doc. 181 at 8–9). The METL Report concluded that the fracture of the

stud "initiated within the heat affected zone from the weld joining the stud to the plate," and that "[i]t is possible that residual stresses from the heating/cooling of the stud during weld[ing] led to initiation in this location." (Doc. 155-5 at 21). The report further found that the fracture "appears to have progressed directly across the diameter of the stud via transgranular cleavage which is indicative of a rapid failure." (Doc. 155-5 at 21). On that basis, Defendant argues that Plaintiff was on notice that the fracture occurred at the weld and that the welding process could have cause the failure such that Plaintiff should have investigated further. In addition, Defendant cites Dr. Vecchio's testimony in 2022 that from the photographs in the METL Report, "it was clear that that stud had failed by fatigue." (Doc. 156-7 at 21). Thus, Defendant argues that Plaintiff should have known of fatigue issues when it received the METL Report, which undisputedly occurred in 2013.[4] (Doc. 181 at 8; Doc. 155-5 at 2).

Plaintiff counters that the statute of limitations did not accrue upon Plaintiff's receipt of the METL Report because it hired Defendant to review the design of the expansion joint and identify flaws—in other words, Plaintiff argues that it acted diligently by hiring Defendant, and it is Defendant's failure to identify the stud fatigue issue that gives rise to the breach of contract claim. As discussed *infra* Section III.c.i, the scope of Defendant's work under the P.O. is a disputed issue of fact that must be resolved by the jury. But if a factfinder decides that issue in Plaintiff's favor, it could also find that Plaintiff exercised reasonable diligence in 2013 by hiring Defendant to review the expansion joint assembly, forwarding Defendant the METL Report, and relying on Defendant's summary of the METL Report, which stated that "[Defendant] is of the opinion that there are no apparent significant deficiencies in the materials utilized and these materials likely did not contribute to the failure." (Doc. 154-1 at 9; Doc. 181 at 8). Accordingly, the Court cannot conclude as a matter of law that the statute of limitations accrued when Plaintiff received the METL Report.

---

[4] To be clear, Plaintiff disputes whether it *saw* the METL Report in 2013, but it undisputedly *received* the report. (Doc. 195 at 10).

Second, Defendant argues that Mr. Heitzenrater's March 28, 2013 email, discussed *supra* Section II.a.i.2, should have prompted Plaintiff to investigate metal fatigue. The email was sent in response to a thread with edits to a draft Root Cause Report prepared by Defendant and merely said in relevant part, "Bagged [material] should be directly equated to a weight when used in the [paragraph] regarding cycles. Are the tire passes single tire passes on an [expansion] plate?" (Doc. 156-3 at 3). Certainly, on the face of the email alone, it is not clear that Plaintiff knew or should have known of the facts underlying its breach of contract claim at that time. Still, as stated above, Mr. Heitzenrater, Plaintiff's Engineering Manager, testified that his email reflected his concern about the fatigue life of the studs. (Doc. 153 at 6). On the other hand, his Declaration properly states that his concern was for the fatigue life of the PHX Sky Train System as a whole, not necessarily of the studs specifically, and that he did not know of any existing fatigue life issues. (Doc. 181-1 at 4). Thus, Mr. Heitzenrater's email and the related evidence does not "irrefutably demonstrate" that Plaintiff should have known of the alleged breach of contract at that time, and it will be for a factfinder to weigh the evidence and draw inferences to determine whether the statute of limitations accrued.

Third, Defendant argues that the statute of limitations accrued no later than May 1, 2015, because Dr. Vecchio had access to the METL Report—containing the photos that he testified in 2022 made "clear that that stud had failed by fatigue"—by that date as Plaintiff's expert in the 2014 Litigation. As discussed *supra* Section II.a.ii, the Court will not infer as a discovery sanction that Dr. Vecchio's 2014 Litigation file included the METL Report. And as discussed *supra* Section II.a.i.1, Dr. Vecchio's Declaration properly states that he did not receive a copy of the METL Report in the 2014 Litigation and that he saw the report for the first time in 2022. (Doc. 182-4 at 3). Thus, Defendant's argument relies on a disputed issue of fact and is not proper for summary judgment. The Court cannot conclude as a matter of law that Plaintiff's breach of contract claim is barred by the statute of limitations.

Nor can the Court find that Plaintiff's claim is barred by the statute of repose.

Ordinarily, a construction contract claim may not be brought "more than eight years after substantial completion" of the improvement. A.R.S. § 12-552(A). Notwithstanding that provision, though, "if the injury occurred during the eighth year after substantial completion or, in the case of a latent defect, was not discovered until the eighth year after substantial completion," an action may be brought within one year of the date of the injury or discovery but not more than nine years after substantial completion. *Id.* § 12-552(E). Here, the parties agree that the PHX Sky Train System project was substantially completed in April 2013 when it first carried passengers. (Doc. 152 at 14; Doc. 195 at 11); *see* A.R.S. § 12-552(H) ("[A]n improvement to real property is considered substantially complete when . . . [i]t is first used by the owner or occupant of the improvement."). The Recent Failures were first discovered in September 2020, within the eighth year after substantial completion. (Doc. 181 at 24). Plaintiff initiated this action in August 2021, within a year of the injury and less than nine years after substantial completion. (Doc. 1). Although Defendant argues that Plaintiff knew or should have known of the alleged defect no later than 2015 such that the statute of repose does not save Plaintiff's claim, that argument relies on the same disputed issues of fact as Defendant's statute of limitations argument. Accordingly, the Court will not grant summary judgment on timeliness grounds.

### c. BREACH OF CONTRACT

Defendant also moves for summary judgment on the merits of Plaintiff's breach of contract claim. The parties agree that Pennsylvania law governs the breach of contract claim. Under Pennsylvania law, a breach of contract claim consists of three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). The parties do not dispute the validity of the MSA and P.O. as contracts, but Defendant argues that Plaintiff cannot, as a matter of law, establish the breach or damages elements.

///

### i. Breach

Plaintiff's breach of contract claim asserts that Defendant breached Section 54.0 of the MSA, which provides:

> The standard of care for all professional engineering, consulting and related services performed or furnished by [Defendant] and its employees under this Agreement will be the care and skill ordinarily used by members of [Defendant]'s profession practicing under the same or similar circumstances at the same time and in the same locality.

(Doc. 155-2 at 37). The parties disagree both as to the scope of the services that Defendant was required to perform under the P.O. and as to whether Defendant met the requisite standard of care.

The scope of work called for under the P.O. is a matter of contract interpretation. "The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). If a contract's terms are unambiguous, "the intent of the parties is to be ascertained from the document itself." *Id.* If the terms are ambiguous, however, "parol evidence is admissible to explain or clarify or resolve the ambiguity." *Id.* Ambiguity exists if the contract "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Id.* at 469; *see also Tennant v. Range Res. - Appalachia, LLC*, 561 F. Supp. 3d 522, 531 (W.D. Pa. 2021) ("[S]ummary judgment is only appropriate for an issue of contract interpretation where 'the contract is so clear that it can be read only one way.'" (citation omitted)).

The parties agree that the P.O. limits Defendant's scope of work to "the Type 2 and Type 3 running plinth expansion joints installed for the PHX Sky Train system." (Doc. 156-4 at 2; *see* Doc. 152 at 16; Doc. 195 at 12). They disagree, however, as to the meaning of that contractual language. Defendant emphasizes the word "plinth" to argue that it was obligated to review *only* the design of the concrete plinths, while Plaintiff

emphasizes the words "expansion joints" to argue that Defendant was obligated to review the entire expansion joint assembly, to include the welds that would go on to fail in the Recent Failures.

The Court finds the phrase "running plinth expansion joints" to be reasonably susceptible of either understanding. There is merit to Defendant's argument that Plaintiff's construction of the phrase would render the modifier "running plinth" superfluous. But there is equal merit to Plaintiff's argument that Defendant's construction would render the object noun "expansion joints" superfluous. Moreover, the phrase at issue here is distinct from Defendant's example of "intentional tort"—where an intentional tort is one of several types of torts, so "intentional" narrows the class of "torts"—because there is no evidence that a "running plinth expansion joint" is one of several types of expansion joints such that "running plinth" narrows the class of "expansion joints." (Doc. 209 at 11 (citing *Steigerwalt v. Terminix Int'l Co., LP*, 246 F. App'x 798, 801 (3d Cir. 2007)). Instead, here, "running plinth expansion joints" seems to consist of two noun phrases—"running plinth" and "expansion joints"—with a running plinth being a component part, apparently in all cases, of an expansion joint. It is therefore unclear what the parties intended the phrase as a whole to mean.

Other contractual terms do not resolve the parties' intent, either. Defendant argues that the use of the singular "design" in Task 1 of the P.O.—which calls for Defendant to review "the original design provided by [CK/SGI]"—supports its position. (Doc. 156-4 at 3). But Plaintiff presents evidence that CK/SGI only issued one design, making the use of the singular meaningless. (Doc. 181 at 33). Defendant further cites to Section 55 of the MSA, which provides that Defendant "shall be entitled . . . to require that no provisions extend [its] duties or liabilities . . . beyond those set forth in this Agreement." (Doc. 155-2 at 38). But the question before the Court is whether Defendant subsequently *agreed* to extend its obligations to the entire expansion joint assembly when it entered into the P.O.; the fact that Defendant had the right not to do so under the MSA sheds no light on whether Defendant in fact did so. Finally, Defendant argues that Section 56 of the

MSA—which provides that Defendant's "review or approval of a specific item shall not indicate approval of an assembly of which the item is a component"—supports its construction of the P.O.'s scope. (Doc. 155-2 at 38). While that provision would likely mean that Defendant is not liable *if the Court agreed with Defendant's argument that the scope of the P.O. was limited to the concrete plinths*, it does nothing to demonstrate that the parties in fact intended for the P.O. to be so limited. Thus, the MSA and P.O. do not, on their face, clearly show the intended scope of Defendant's work.

The Court must also consider whether the parties' course of performance establishes a clear intent. *See Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978) ("[C]ourse of performance is always relevant in interpreting a writing."). "Course of performance" refers to "a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract." *J.W.D. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, 810 A.2d 672, 683–84 (Pa. Super. Ct. 2002). Here, the conduct between the parties following contract formation does not illuminate the parties' intent either. Defendant argues that the fact that Plaintiff did not ask for any addition work and instead praised Defendant's work after receiving the Root Cause Report suggests that Defendant fully performed the work called for by the P.O. But, as Plaintiff argues, those actions are not necessarily out of line with Plaintiff's construction of the P.O. If Defendant was supposed to diagnose potential defects in the design of the expansion joint as a whole, it would be perfectly reasonable for Plaintiff to respond with praise to Defendant's identification of problems with the concrete plinth—a component of the expansion joint—unaware that other components had not been reviewed. Having considered the contractual language and the course of performance, the Court finds Defendant's scope of work under the contract to be ambiguous.

As noted above, the interpretation of an ambiguous contract must be resolved by a factfinder, not on summary judgment. Both parties present extrinsic and parol evidence that would be sufficient for a reasonable factfinder to interpret the contract in their favor. For example, Defendant argues that surrounding circumstances such as the timing of its

work and the amount that it was paid suggest that the parties could not have intended for Defendant to review the design of the entire expansion joint assembly. (Doc. 152 at 17, 19–20); *see Windows v. Erie Ins. Exch.*, 161 A.3d 953, 958 (Pa. Super. Ct. 2017) ("Where the words used in a contract are ambiguous, the surrounding circumstances may be examined to ascertain the intent of the parties." (citation and quotation marks omitted)). On the other hand, Plaintiff presents, for example, correspondence to and from Defendant referring to Defendant's review of the "ride plates" and "expansion joints," suggesting that the parties did not intend for the review to be limited to the concrete plinths. (Doc. 195 at 14–15). Accordingly, the scope of Defendant's work under the P.O. cannot be resolved on summary judgment.

To show that it is entitled to judgment as a matter of law on the breach of contract claim, then, Defendant would need to show that Plaintiff cannot establish that Defendant fell short of the contractual standard of care under either interpretation of the P.O.'s scope. Defendant makes no attempt to show that Plaintiff cannot prove a breach if the scope of Defendant's work was the entire ride plate assembly.[5] Defendant is therefore not entitled to summary judgment based on the breach element.

### ii. Damages

Defendant also moves for summary judgment based on the damages element. Initially, "[u]nder Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 645 (W.D. Pa. 2013). As a result, "summary judgment cannot be granted for failure to show damages." *Zeno v.*

---

[5] To the extent Defendant argues that Plaintiff needs expert testimony to prove a breach and it lacks such testimony, the Court disagrees with the premise and thus need not further consider the argument. Expert testimony is necessary "when the subject matter of the inquiry is one involving special skills and training not common to the ordinary lay person." *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. Ct. 1988). Given that Plaintiff presents evidence that Defendant altogether failed to perform a comprehensive review of the ride plate anchor studs, (Doc. 181 at 34–35), if such work was called for by the P.O., an ordinary lay person could reasonably conclude that Defendant breached the contract without expert testimony.

*Ford Motor Co.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007). Regardless, though, the Court finds that Defendant's arguments for summary judgment on this element are without merit. "In a breach of contract action, a party is entitled to recover whatever damages it suffered, provided the damages were such that would naturally and ordinarily result from the breach, or the damages were reasonably foreseeable and within the contemplation of the parties at the time of contracting and can be proved with reasonable certainty." *James Corp. v. N. Allegheny Sch. Dist.*, 938 A.2d 474, 497 (Pa. Commw. Ct. 2007).

Plaintiff raises numerous material factual disputes in response to Defendant's arguments. Defendant argues that because Plaintiff does not own the PHX Sky Train System but instead receives monthly payments for its operation from the City, the demolition and repair costs claimed by Plaintiff as damages were not a natural or foreseeable result of the alleged breach—and that Plaintiff voluntarily undertook demolition and repair of the expansion joints such that the costs are not recoverable. But Plaintiff presents evidence that its design-build contract with the City obligated it to do so. (Doc. 250 at 6). Defendant further argues that Plaintiff's decision to demolish and replace thirty-two Type 3 ride plates after analyzing only four of them for fatigue cracks was unreasonable,[6] but Plaintiff presents evidence that a review of the Type 3 ride plate design concluded that the fatigue issue resulted from the stud design used for all Type 3 ride plates. (Doc. 181 at 35–36). Defendant next argues that Plaintiff's requested damages fail to account for the useful life of the ride plates, which would require expert

---

[6] To the extent Defendant request spoliation sanctions based on Plaintiff's demolition of the ride plates, (Doc. 152 at 21 n.8), the request is untimely. "[A] motion regarding spoliation should be filed as soon as reasonably possible after discovery of the facts that underlie the motion." *Scalia v. County of Kern*, 576 F. Supp. 3d 703, 714 (E.D. Cal. 2021) (citation and quotation marks omitted). Courts deny spoliation motions as "untimely when the spoliation is not raised until after the close of discovery." *Id.* Moreover, the Case Management Order provides that "[t]he discovery deadline concludes . . . the time for the Court to resolve all discovery disputes." (Doc. 30 at 2 n.1). Complaints about failure to produce evidence—including complaints of spoliation—"are clearly discovery disputes." *Kinnally v. Rogers Corp.*, No. CV-06-2704-PHX-JAT, 2008 WL 4850116, at *4 (D. Ariz. Nov. 7, 2008).

testimony that Plaintiff has not designated. But Plaintiff presents evidence to support its argument that under Plaintiff's contracts with the City, the useful life of the ride plates would not inure to Plaintiff's benefit, and Plaintiff would not have been obligated to replace the ride plates at the end of their useful life, making its damages for the alleged breach the full cost of demolition and replacement. (Doc. 195 at 19).

Nonetheless, the Court finds merit to one of Defendant's arguments and will grant summary judgment to the extent that Plaintiff cannot recover damages for the costs associated with the investigation, redesign, and reinstallation of the Types 2, 4, and 5 ride plates. Initially, as the Court's October 3, 2022 Order (Doc. 70) suggested, defects in those ride plates are beyond the scope of Plaintiff's Complaint and First Amended Complaint (Docs. 1, 105). Even if they were within the scope of this litigation, though, the Court would reach the same conclusion. First, Plaintiff acknowledges that it "is not alleging damages against HDR related to defects in the Type 4 and 5 ride plates" because indisputably, Defendant's "scope of work only related to a review of the Type 2 and 3 ride plates." (Doc. 249 at 6). Thus, Plaintiff's Sur-Reply asserts that "Type 4 and 5 ride plates will not be a part of this case." (Doc. 249 at 6). But Plaintiff's Supplemental Statements of Fact—including the Supplemental Statement of Facts submitted contemporaneously with the Sur-Reply—includes costs for the Types 4 and 5 ride plates *lumped together with* costs for the Type 2 ride plates, as does most of the evidence cited in support thereof. (Doc. 181 at 36; Doc. 182-5 at 4, 7–9; Doc. 184-2; Doc. 250 at 7). Plaintiff has therefore failed to present evidence that would support the recovery of damages related to Type 2 ride plates alone. Summary judgment will be granted as to damages related to the Types 2, 4, and 5 ride plates, and will otherwise be denied.

**IV.   CONCLUSION**

In sum, Plaintiff is not entitled to damages for costs associated with the Types 2, 4, and 5 ride plates, but there are disputes of material fact as to when the statute of limitations accrued, whether Defendant breached the Contract, and the rest of Plaintiff's alleged damages. Those disputes must be resolved at trial by a finder of fact.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 152) is **granted in part** to the extent that Plaintiff cannot recover damages for costs associated with the investigation, redesign, and reinstallation of the Types 2, 4, and 5 ride plates, and is otherwise **denied in part**.

Dated this 8th day of August, 2023.

Honorable Steven P. Logan
United States District Judge